**Albert E. PASCHAL,**
**Petitioner-Appellant,**

v.

**Louie L. WAINWRIGHT, etc.,**
**Respondent-Appellee.**

No. 82–3088.

United States Court of Appeals,
Eleventh Circuit.

Aug. 13, 1984.

Archibald J. Thomas, III, Asst. Federal Public Defender, Jacksonville, Fla., for petitioner-appellant.

Raymond L. Marky, Asst. Atty. Gen., Earl H. Archer, Gen. Counsel, Florida Parole & Probation Com'n, Tallahassee, Fla., for respondent-appellee.

Before TJOFLAT and HILL, Circuit Judges, and SIMPSON, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

The petitioner, Albert E. Paschal, is serving a life sentence in a Florida prison. The Florida Parole and Probation Commission has given him a presumptive parole release date of March 29, 1993. Petitioner contends that the Commission, in setting this release date, violated the ex post facto clause of Article I, Section 10, of the Constitution, and he seeks a writ of habeas corpus ordering the Commission to consider him for parole immediately. The district court found no ex post facto violation and denied the writ. We affirm.

I.

In 1970, petitioner was convicted of first degree murder in Duval County, Florida and sentenced to death. In 1972, the sentencing judge modified petitioner's sentence to life imprisonment, thus making petitioner eligible for parole at the discretion of the Florida Parole and Probation Commission (the Commission). The Commission first considered petitioner for parole in 1974. One of the Commission's hearing examiners interviewed petitioner and recommended that he not be paroled; the Commission followed this recommendation. The Commission denied petitioner parole again in 1975, 1976, 1977, and 1978, on each occasion following the recommendation of its hearing examiner.

In July 1978, the Florida legislature passed the Objective Parole Guidelines Act of 1978 (the Parole Act), Fla.Stat.Ann. §§ 947.001–.24 (1983 Supp.). The Parole Act required the Commission to adopt parole "guidelines," creating presumptive parole release dates based on the "seriousness of the offense" committed and "the likelihood of a favorable parole outcome," and to consider these guidelines in making release decisions. Fla.Stat.Ann. § 947.165 (1983 Supp.). In April 1979, the Commission, having promulgated guidelines as required by the Act,[1] again considered petitioner for parole. The guidelines rated petitioner's first degree murder offense as "greatest most serious," the highest possible offense severity rating, and indicated that he was a poor parole risk. The guidelines called for a term of incarceration of 226 to 288 months. Following these guidelines, the Commission denied petitioner parole because he had served only 111 months and gave him a "presumptive release date" of September 29, 1992 conditioned on his maintaining satisfactory "institutional conduct." Fla.Stat.Ann. § 947.-1745 (1983 Supp.). When petitioner did not maintain such conduct, committing several disciplinary infractions, the Commission, drawing on its authority under the Parole Act, extended his presumptive release date to March 29, 1993.

A few months prior to the Commission's extension of petitioner's presumptive release date petitioner instituted mandamus proceedings against the Commission in the Florida District Court of Appeal to compel the Commission to consider him for immediate parole. He alleged that the guidelines were invalid because they precluded the Commission from considering him for parole "at any time," as it could under prior law, and thus had effectively extended his term of imprisonment. This, petitioner argued, imposed punishment not in existence at the time of his offense and

violated the ex post facto prohibition of the U.S. Constitution. The Florida court summarily refused to issue the requested writ of mandamus. Petitioner, having exhausted his state remedies, then brought these habeas corpus proceedings in the district court, presenting the same ex post facto claim and seeking immediate parole consideration. He requested an evidentiary hearing to prove that the Commission, operating under the new Parole Act, had ceased considering him eligible for parole.

The district court rejected petitioner's claim as insufficient as a matter of law. Comparing the Commission's authority under the Parole Act with that accorded the Commission under the prior law, the court concluded that the Act in no way limited the Commission's discretion to grant parole. Nor did the guidelines limit the Commission's discretion; instead, they merely served to "clarify the procedure utilized [by the Commission] in making [parole] decision[s]." In sum, there was no ex post facto violation.

Petitioner appeals. Considering Florida's sentencing and parole model in light of governing case law and the policies underpinning the ex post facto clause, we agree with the district court and hold that the Commission's application of the Parole Act to petitioner's case in setting his presumptive parole release date did not violate the ex post facto clause.

## II.

The U.S. Constitution contains two ex post facto clauses, one applicable to the states, article 1, section 10, clause 1, and one to the federal government, article 1, section 9, clause 3. In this appeal we consider the clause addressed to the states: "No state shall ... pass any ... ex post facto law."

 The Supreme Court has held that three critical elements must be present to

---

**1.** These guidelines are not in the record before us. The parties neither introduced them into evidence nor requested the district court judicially to notice them. Our description of the guidelines in this opinion is derived from the worksheets the Commission's hearing examiner used when he conducted petitioner's April 1979 parole hearing. It is apparent that the guidelines in force at the time of that hearing have since been amended significantly.

establish an ex post facto clause violation: the statute must be a penal or criminal law,[2] retrospective,[3] and disadvantageous to the offender because it may impose greater punishment.[4] *Weaver v. Graham,* 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981). A law may violate the ex post facto prohibition even if it "merely alters penal provisions accorded by the grace of the legislature," *id.* at 30–31, 101 S.Ct. at 965; it need not impair a "vested right." *Id.* A law which is merely procedural and does not add to the quantum of punishment, however, cannot violate the ex post facto clause even if it is applied retrospectively. *Id.* at 32–33 & n. 17, 101 S.Ct.

at 966 & n. 17. *See Dobbert v. Florida,* 432 U.S. 282, 293, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977) ("even though it may work to the disadvantage of a defendant, a procedural change is not *ex post facto*."); *see also Thompson v. Missouri,* 171 U.S. 380, 18 S.Ct. 922, 43 L.Ed. 204 (1898); *Hopt v. Utah,* 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884). With these principles in mind, we consider whether petitioner has stated an ex post facto claim.

The second element of an ex post facto claim is plainly present in this case; the Parole Act and the Commission's guidelines were applied retrospectively to petitioner. The third element is not present, however;

---

**2.** Some support exists for the proposition that the ex post facto clauses apply to civil statutes as well. *See* Crosskey, *The True Meaning of the Constitutional Prohibition of Ex-Post Facto Laws,* 14 U.Chi.L.Rev. 539 (1947). Modern courts, however, have applied the ex post facto clauses only to criminal statutes. *Warren v. United States Parole Comm'n,* 659 F.2d 183, 186–7, n. 15 (D.C.Cir.1981); *see Harisiades v. Shaughnessy,* 342 U.S. 580, 594, 72 S.Ct. 512, 521, 96 L.Ed. 586 (1952).

**3.** That is, the law must apply to events occurring before its enactment. *Weaver v. Graham,* 450 U.S. 24, 29 & n. 11, 101 S.Ct. 960, 964 & n. 11, 67 L.Ed.2d 17 (1981), citing *Jaehne v. New York,* 128 U.S. 189, 194, 9 S.Ct. 70, 71–72, 32 L.Ed. 398 (1888). *See also Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 137, 3 L.Ed. 162 (1810) ("An ex post facto law is one which renders an act punishable in a manner in which it was not punishable when it was committed.")

**4.** In assessing whether a provision is disadvantageous, courts must look to the challenged provision itself and ignore any extrinsic circumstances that may have mitigated its effect on the particular individual. *Weaver,* 450 U.S. at 33, 101 S.Ct. at 966; *Dobbert,* 432 U.S. at 300, 97 S.Ct. at 2301–02. *See Calder v. Bull,* 3 U.S. (3 Dall.) 386, 390, 393, 1 L.Ed. 648 (1798). Ex post facto analysis "is concerned solely with whether a statute assigns more disadvantageous criminal or penal consequences to an act than did the law in place when the act occurred." *Weaver,* 450 U.S. at 30 n. 13, 101 S.Ct. at 964–65 n. 13. In other words, the legislature must provide *punishment* for past conduct. *See Flemming v. Nestor,* 363 U.S. 603, 614–17, 80 S.Ct. 1367, 1374–75, 4 L.Ed.2d 1435 (1960) (deported alien's loss of Social Security benefits nonpunitive and valid); J. Nowak, R. Rotunda, & J. Young, Handbook on Constitutional Law 435 (1978).

In *Ex parte Garland,* 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1866), the Supreme Court labeled as

penal a post-Civil war statute that required lawyers desiring to practice in federal court to swear they had not participated in the rebellion. The statute was punitive because the swearing of the oath had no relationship to the practice of law. Because the law was penal in nature, applied to past conduct, and detrimental to the petitioner, it violated the ex post facto clause and was unconstitutional. In *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (1963), the Supreme Court considered, in a due process case, whether a forfeiture-of-citizenship provision of the immigration laws amounted to punishment. The Court described the standards traditionally applied to determine whether a statute is punitive or penal in nature:

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter,* whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions.

(footnotes omitted); *accord, Bell v. Wolfish,* 441 U.S. 520, 537–38, 99 S.Ct. 1861, 1873, 60 L.Ed.2d 447 (1979). *See also United States v. Lovett,* 328 U.S. 303, 324, 66 S.Ct. 1073, 1083, 90 L.Ed. 1252 (1946) (Frankfurter, J., concurring): "The fact that harm is inflicted by governmental authority does nòt make it punishment. Figuratively speaking all discomforting action may be deemed punishment because it deprives of what otherwise would be enjoyed. But there may be reasons other than punitive for such deprivation."

an examination of the parole process both before and after the Parole Act shows that neither the Parole Act nor the guidelines have operated to petitioner's detriment. Since this essential element of an ex post facto claim is missing, we need not address the remaining question, whether the Parole Act and the guidelines are penal or criminal laws.

### A.

At the time of petitioner's crime, September 25, 1968, the Florida sentencing model was a creature of legislative, judicial, and executive prerogative. The legislature prescribed the type and range of sanctions that could be imposed for committing a given crime. The sentencing judge selected the sanction to be handed down in the case before him; if the sentence fell within the legislative prescription it was immune from judicial review. *Dickinson v. State,* 170 So.2d 594, 595 (Fla.App.1965); *accord, Wilkinson v. State,* 322 So.2d 620 (Fla. App.1975). The defendant's only recourse was to the Governor [5] or the Parole Commission. *Stanford v. State,* 110 So.2d 1, 2 n. 4 (Fla.1959); *accord, Michell v. State,* 154 So.2d 701, 703 (Fla.App.1963). If the defendant was serving a prison sentence, the Commission could parole him subject to any conditions that would ensure that his release was "compatible with [his] welfare and the welfare of society." Fla.Stat.Ann. § 947.18 (1973). Parole was "not an act of amnesty or forgiveness—as some suppose[d but r]ather, ... a continuation of sentence." *Sellers v. Bridges,* 153 Fla. 586, 15 So.2d 293, 295 (1943). It was granted as a matter of grace, not as a matter of right.[6]

At the time petitioner committed the first degree murder in this case, Florida maintained a "medical model" sentencing and corrections scheme [7] for felony inmates like petitioner and for inmates with multiple misdemeanor sentences aggregating more than one year. Rehabilitation was a primary goal of the corrections process. *See, e.g.,* Fla.Stat.Ann. § 947.13(1)(f)(2); 947.-17(2), (5) and (6); 947.20; and 947.21 (1973). The Commission pursued this goal by monitoring the inmate's rehabilitative progress and, when parole was otherwise indicated, releasing him from custody if he showed himself to be a good parole risk. Otherwise, the inmate remained incarcerated for his full term.

In deciding whether to grant parole, the Commission considered many criteria. *See* Fla.Stat.Ann. §§ 947.17(2); 947.18 (1973); Florida Probation and Parole Commission, Twenty-eighth Annual Report (1968). These criteria included whether the inmate's release would depreciate the seriousness of the crime he committed or promote disrespect for the law, whether that crime was so serious that further punishment was needed, the inmate's prior criminal record including previous probation or parole violations, whether his prison adjustment and violation of prison rules required more time to be served, whether his release would adversely affect institutional discipline, whether he took advantage of opportunities for self-improvement while incarcerated, and whether continued incarceration would permit him to avail himself of needed correctional or medical treatment or vocational training.

Fla.Stat.Ann. § 947.18 (1973) gave the Commission complete discretion to fashion an inmate's conditions of release. It also

---

**5.** The defendant could apply for executive clemency in the form of a pardon or commutation of punishment. Fla.Stat. §§ 940.01–06 (1973 & 1983 Supp.). Such applications have not been routinely granted, however. In practice, the dominant executive role in Florida's sentencing scheme has been played by the Parole Commission, as we indicate in the text *infra.*

**6.** The fact that parole is purely a matter of grace in Florida does not, of course, immunize the Parole Act from ex post facto scrutiny. *Weaver,*

450 U.S. at 29–31, 101 S.Ct. at 964–5. In conducting our examination we are mindful that "[w]hether a retrospect state criminal statute ameliorates or worsens conditions imposed by its predecessor is a federal question." *Weaver,* 450 U.S. at 33, 101 S.Ct. at 966 (citing cases).

**7.** Under a medical model statute, the Parole Commission operates as a "doctor," releasing the inmate when he is "cured," or rehabilitated.

imposed several constraints on the Commission's exercise of its discretion. It cautioned the Commission that:

No person shall be placed on parole merely as a reward for good conduct or efficient performance of duties assigned in prison. No person shall be placed on parole until and unless the commission shall find that there is reasonable probability that, if he is placed on parole, he will live and conduct himself as a respectable and law abiding person, and that his release will be compatible with his own welfare and the welfare of society. No person shall be placed on parole unless and until the commission is satisfied that he will be suitably employed in self-sustaining employment, or that he will not become a public charge.[8]

In sum, the decision to grant or deny parole, though guided by statute, resided solely with the Commission. Its discretion, properly exercised, was unreviewable and absolute. *Moore v. Florida Parole and Probation Commission,* 289 So.2d 719 (Fla.), *cert. denied,* 417 U.S. 935, 94 S.Ct. 2649, 41 L.Ed.2d 239 (1974). An inmate could seek mandamus review in the courts, but could not thereby obtain a grant of parole. A writ could issue only to require the Commission to exercise its discretion and *consider* him for parole. *See Moore,* 289 So.2d at 720.

### B.

In 1978, the Florida Legislature passed the Parole Act because the previous system lacked objective criteria for parole decision making and, thus, was "subject to allegations of arbitrary and capricious release [decisions]." Fla.Stat.Ann. § 947.002(1) (1983 Supp.). The legislature intended to establish an "objective means for determining and establishing parole criteria ... designed to give primary weight to the seriousness of the offender's present criminal offense and his past criminal record [two of the former criteria]." The basic features of the prior scheme are carried forward under the new law;[9] most important for our purposes, the ultimate parole decision remains committed to the Commission's discretion. Fla.Stat.Ann. § 947.1745 (1983 Supp.); *May v. Florida Parole and Probation Commission,* 435 So.2d 834, 837–8 (Fla.1983); *Staton,* 665 F.2d at 688.

The Parole Act, however, has changed the manner in which the Commission's discretion may be exercised. Whereas previously the Commission made its release decisions on an ad hoc basis, the Parole Act requires the Commission to maintain "objective guidelines" to channel its decision making. These guidelines must be "developed according to an acceptable research method and ... based on the seriousness of offense and the likelihood of favorable parole outcome." Fla.Stat.Ann. § 947.165(1) (1983 Supp.). They must also be revised yearly to take into account the latest statistical data regarding prior parole decision results. *Id.* at 947.165(2). *See Lopez v. Florida Parole and Probation Commission,* 410 So.2d 1354 (Fla.App.), *cert. denied,* 459 U.S. 905, 103 S.Ct. 207, 74 L.Ed.2d 166 (1982).

---

**8.** These constraints continued to limit the Commission's power to grant parole under the present sentencing scheme described in subpart B. *infra;* for in 1977 the Legislature reenacted section 947.18. In doing so, it added a sentence to the section authorizing the Commission to impose the following additional parole condition: "In addition to any other lawful condition of parole, the commission may make the payment of the debt due and owing to the state under § 960.17 or the payment of the attorney's fees and costs due and owing to a county under § 27.56 a condition of parole, subject to modification based on change of circumstances." Fla. Stat.Ann. § 947.18 (1983 Supp.).

**9.** For example, parole is still a matter of executive grace; inmates have no liberty interest in, or entitlement to, parole. Fla.Stat.Ann. § 947.-002(6) (1983 Supp.); *see also Staton v. Wainwright,* 665 F.2d 686, 688 (5th Cir. Unit B), *cert. denied,* 456 U.S. 909, 102 S.Ct. 1757, 72 L.Ed.2d 166 (1982). Rehabilitation remains a primary goal of corrections; the Act requires the Florida Department of Health and Rehabilitative Services and all other state agencies to assist the Commission in performance of its duties, including inmate rehabilitation. Fla.Stat.Ann. § 947.13 (1983 Supp.); *id.* at § 947.135 (Mutual Participation Plan of 1976).

The guidelines the Commission promulgated following the adoption of the Parole Act and applied in petitioner's case were a series of schedules assessing the seriousness of the crime for which an inmate had been incarcerated ("offense severity rating") and predicting his chances of successfully completing parole ("parole prognosis"). The hearing examiner initially would determine which offense severity rating and parole prognosis schedules applied to the inmate. The examiner would choose an offense severity rating from a highly particularized schedule of offense ratings. The examiner would arrive at the parole prognosis by considering certain "salient factors" such as the inmate's prior convictions, prior incarcerations, prior probation or parole revocations, prior escapes, the inmate's age at first commitment, and whether his present sentence resulted from a burglary conviction. Once the examiner had determined the inmate's offense severity rating and parole prognosis he would consult a grid to determine a "matrix time range" that the inmate presumptively would have to serve before he was paroled. The examiner then would consider any circumstances not taken into account by the guidelines that would tend to aggravate or mitigate the severity of the inmate's offense or to suggest a parole prognosis different from that indicated by the guidelines. Fla.Stat.Ann. § 947.172(2) (1983 Supp.). After weighing these circumstances, the examiner would recommend to the Commission one of three alternatives: the Commission should give the inmate a presumptive parole date within the matrix time range, above that range due to aggravating circumstances, or below that range due to mitigating circumstances. If the examiner recommended a date outside the matrix range, he would have to explain the discrepancy in writing to the Commission. *Id.* The Commission could either accept the examiner's recommended date or set a new one. *Id.* The Commission's decision could be changed upon administrative, *id.* at § 947.173 (1983 Supp.), or judicial review, *see e.g., Tobin v. Greadington,* 414 So.2d 36 (Fla.App.1982), which could be initiated by the inmate, or by the Commission itself following a subsequent parole hearing. *See* Fla.Stat.Ann. § 947.174 (1983 Supp.).

### C.

Petitioner claims that the Commission's use of the challenged guidelines increased his punishment because, realistically, he will not be considered eligible for parole until the presumptive date, March 29, 1993. This claim, although not frivolous, is without merit as a matter of law. "It is axiomatic that for a law to be *ex post facto* it must be more onerous than the prior law." *Dobbert,* 432 U.S. at 294, 97 S.Ct. at 2299. The Parole Act and guidelines are not more onerous than prior law. They did not substantively alter petitioner's parole eligibility or confine the Commission's discretion to release him; they merely clarified the exercise of administrative discretion. *Accord, May v. Florida Parole and Probation Commission,* 435 So.2d 834 (Fla.1983). *Compare* Fla.Stat.Ann. § 947.16 (1973) *with* Fla.Stat.Ann. 947.16(1) (1983 Supp.); *see also id.* at § 947.18; Florida Probation and Parole Commission, Twenty-eighth Annual Report (1968).

Whether we view petitioner's case under Florida's previous parole scheme or the Parole Act, the key to the Commission's release decision was the seriousness of petitioner's offense, first-degree murder, and the likelihood that he would lead a law-abiding life if paroled. The Parole Act authorized the Commission to release petitioner on a date above, below, or within the matrix time range set by the guidelines. Fla.Stat.Ann. § 947.172(3); *see also Staton,* 665 F.2d at 688, ("the Commission retains substantial discretionary powers over the granting of a parole"). In essence, the Commission had the same authority it had under prior law; it could have released petitioner immediately had there been a "reasonable possibility" that his release would "be compatible with his own welfare and the welfare of society." Fla.Stat.Ann. § 947.18 (1983 Supp.); *see also Gobie v. Florida Parole and Probation Commission,* 416 So.2d 838 (Fla.App. 1982).

Moreover, the guidelines were based on prisoner and parolee case histories, *see* Fla. Stat.Ann. § 947.165(1) & (2) (1983 Supp.), and called for inmates to serve terms equivalent to those served by previous offenders who committed the same crime and constituted a similar parole risk. The guidelines thus ensured an explicit, systematic continuation of the Parole Commission's past practice. *See Lopez v. Florida Parole and Probation Commission,* 410 So.2d 1354 (Fla.App.1982).

■ At the time petitioner committed the murder that led to his incarceration, he was on fair notice that if he received a life sentence he would be subject to parole at the discretion of the Commission. This was not changed.[10] *See* Fla.Stat.Ann. § 947.18; *see also, e.g., Rifai v. United States Parole Commission,* 586 F.2d 695, 699 (9th Cir.1978). The guidelines merely stated and rationalized the exercise of the Parole Commission's discretion. Petitioner accordingly suffered no legislative increase in punishment. *Accord, May,* 435 So.2d at 838 ("There is no showing that the retrospective application of the new guidelines resulted in more onerous or disadvantageous treatment").

Petitioner cites *Weaver v. Graham, supra,* as requiring us to find that the guidelines operated to his detriment in an ex post facto sense. We are not persuaded. In *Weaver,* the Florida legislature repealed a statute mandating nondiscretionary good conduct "gain time" for inmates and passed a law reducing the amount of gain time which prisoners could normally accrue. A prisoner whose offense and sentence occurred when the previous more liberal statute was in force claimed that the new law was void, as ex post facto, when applied to him. The United States Supreme Court agreed, stating that the law retroactively changed the legal consequences attached to the petitioner's crime; the Florida Legislature had increased the punishment that could be meted out for committing that crime by reducing inmates' ability to get gain time.

Petitioner's case is unlike *Weaver* in that petitioner challenges guidelines promulgated by a state agency to guide its discretion, not a mandatory statute adopted by the state legislature.[11] The prisoner in *Weaver* had a mandatory statutory entitlement to receive a certain amount of automatically calculated good time credit. Since no discretion was involved in awarding that good time, the change in the formula by which it was calculated effectively lengthened the term of imprisonment for prisoners who obeyed the institutional rules. 450 U.S. at 34–36, 101 S.Ct. at 967, 968. In contrast, the Commission's parole decision, both under the parole system at the time of petitioner's conviction and under the guidelines, involved the use of discretion and judgment. *See* Fla.Stat.Ann. § 947.172(2) & (3) (1983 Supp.); *Overfield v. Florida Probation and Parole Commission,* 418 So.2d 321 (Fla.App.1982).[12] The promulgation of guidelines under the Act did not alter the consequences that flowed from petitioner's crime: both in 1968 when he committed that crime, and in 1979, when

---

10. *See Weaver,* 450 U.S. at 31, 101 S.Ct. at 965: "Critical to relief under the *Ex Post Facto* Clause is not an individual's right to less punishment, but the lack of fair notice...." When he committed his offense, petitioner was on fair notice that, if convicted, he would be held in prison solely at the discretion of the Parole Commission. He remains incarcerated at the Commission's sole discretion.

11. *See Weaver,* 450 U.S. at 33–36, 101 S.Ct. at 967–68 (discussing automatic, mandatory nature of the unconstitutional statute).

12. In addition to the *Weaver* decision petitioner relies heavily on *Geraghty v. United States Parole Commission,* 579 F.2d 238 (3d Cir.1978), *vacated on other grounds,* 445 U.S. 388, 100 S.Ct.

1202, 63 L.Ed.2d 479 (1980), and its progeny. *Geraghty* dealt with an ex post facto challenge to guidelines promulgated by the U.S. Parole Commission for federal prisoners. In that case the defendant was sentenced before the Commission promulgated its guidelines. The petitioner claimed that the Commission's use of the guidelines to set a presumptive release date for him constituted retroactive punishment for his crime. The Court of Appeals for the Third Circuit agreed that this was possible, holding that the guidelines could operate as an "unyielding conduit" that retroactively decreased parole eligibility. 579 F.2d at 267. The Third Circuit remanded the case to the district court to determine whether the guidelines operated inflexibly to increase petitioner's punishment. Following

the Commission set his presumptive parole date, the Commission had complete discretion over the parole decision. Only the form by which the Commission exercised that discretion changed.

Because petitioner's punishment was not increased when the Commission applied the guidelines and set his presumptive release date, the district court's denial of habeas corpus relief is

AFFIRMED.

the remand, the Supreme Court, on certiorari, vacated the prior decisions in the case on jurisdictional grounds. The Third Circuit recently readopted the *Geraghty* analysis in *United States ex rel. Forman v. McCall,* 709 F.2d 852 (3d Cir.1983). In neither *Geraghty* nor *McCall* did that court hold that the parole guidelines violated the ex post facto clause. Both opinions merely remanded the case to the district court for a determination of whether the guidelines restricted the U.S. Parole Commission's discretion sufficiently to constitute retroactive legislative punishment.

A common sense reading of the Florida Statutes shows clearly that the guidelines at issue in the instant case do not restrict the Florida Parole and Probation Commission's discretion. The Supreme Court of Florida is in accord, *May, supra.* Thus, we do not find *Geraghty* persuasive in this case. The Florida guidelines, of course, were not at issue there. *Geraghty* was a class action decided on summary judgment grounds, and, unlike the petitioner in *Geraghty,* it is clear that the petitioner, here, received full, individualized, consideration throughout. *Ger-*

*aghty's* reasoning has been expressly or implicitly rejected by every other Circuit Court of Appeals that has assessed the ex post facto effect of the U.S. Parole Commission guidelines in adult cases, and a number of state courts deciding similar issues. *See, e.g., Hayward v. United States Parole Commission,* 659 F.2d 857 (8th Cir.1981); *Warren v. United States Parole Commission,* 659 F.2d 183 (D.C.Cir.1981); *Priore v. Nelson,* 626 F.2d 211 (2d Cir.1980); *Zeidman v. United States Parole Commission,* 593 F.2d 806 (7th Cir.1979); *Rifai v. United States Parole Commission,* 586 F.2d 695 (9th Cir.1978); *Ruip v. United States,* 555 F.2d 1331 (6th Cir.1977); *accord, Joost v. United States Parole Commission,* 535 F.Supp. 71 (D.Kan.1982), rev'd on other grounds, 698 F.2d 418 (10th Cir.1983); *Smaldone v. United States,* 458 F.Supp. 1000 (D.Kan. 1978); *Kirby v. United States,* 463 F.Supp. 703 (D.Minn.1979), vacated on other grounds, 600 F.2d 146 (8th Cir.1979); *Richards v. Crawford,* 437 F.Supp. 453 (D.Conn.1977); *Harris v. Irving,* 90 Ill.App.3d 56, 45 Ill.Dec. 394, 412 N.E.2d 976 (Ill.App.1980); *Kochevar v. State,* 281 N.W.2d 680, 689, n. 10 (Minn.1979).