**Douglas Charles DUFRESNE, Petitioner-Appellant,**

v.

**Benjamin BAER, Chairman, U.S. Parole Commission, Et Al., Respondents-Appellees.**

No. 82–5942.

United States Court of Appeals, Eleventh Circuit.

Oct. 29, 1984.

Allen R. Smith, Winter Haven, Fla., for petitioner-appellant.

Rockne Chickinell, Atty., U.S. Parole Commission, Washington, D.C., for respondents-appellees.

Before TJOFLAT and HILL, Circuit Judges, and SIMPSON, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

In these habeas corpus proceedings, the petitioner, a federal prisoner, alleges that the U.S. Parole Commission fixed his presumptive parole release date using guidelines that violated the ex post facto clause of article 1, section 9, of the Constitution. The district court denied relief. We affirm.

## I.

The petitioner, Douglas Dufresne, was a senior pilot for Pan American Airlines. During the late 1970's he began trafficking in illicit drugs, at one point importing eight pounds of raw opium into the United States from Iran. In 1979 a federal grand jury in the Western District of Texas indicted petitioner in three counts for conspiracy to import opium, possession with intent to distribute opium, and conspiracy to import cocaine. The indictment alleged that petitioner committed these acts during the period from March 1978 to March 1979.

On September 17, 1979, petitioner pled guilty to the third count of the indictment,[1] conspiracy to import cocaine, and the district court sentenced him to a partially indeterminate eight-year prison sentence under 18 U.S.C. § 4205(a) (1982).[2] Under this sentence, petitioner would become eligible for parole at the discretion of the U.S. Parole Commission (the Commission) after serving one-third of his eight-year term. *Id.* On January 14, 1980, the court granted petitioner's Fed.R.Crim.P. 35 motion to modify sentence and made petitioner's sentence fully indeterminate under 18 U.S.C. § 4205(b)(2) (1982).[3] Petitioner thus became eligible for parole at any time, at the Commission's discretion.

---

1. On the government's motion, the court dismissed the first two counts of the indictment. *See* Fed.R.Crim.P. 48(a).

2. 18 U.S.C. § 4205(a) (1982) provides in pertinent part:
 Whenever confined and serving a definite term or terms of more than one year, a prisoner shall be eligible for release on parole after serving one-third of such term or terms or after serving ten years of a life sentence or of a sentence of over thirty years ....

3. 18 U.S.C. § 4205(b)(2) (1982) provides in pertinent part:
 Upon entering a judgment of conviction, the court having jurisdiction to impose sentence, when in its opinion the ends of justice and best interest of the public require that the defendant be sentenced to imprisonment for a term exceeding one year, may ... fix the maximum sentence of imprisonment to be served in which event the court may specify that the prisoner may be released on parole at such time as the Commission may determine.

The Commission, acting through the Commissioner in charge of the Southeast Region (regional Commissioner),[4] initially considered petitioner for parole four months later, in May. Following the recommendation of the two examiners who conducted petitioner's parole hearing and applying the Commission's parole guidelines, 28 C.F.R. § 2.20 (1979), the regional Commissioner gave petitioner a presumptive parole release date of fifty-two months. This meant that petitioner would be paroled in fifty-two months if he "substantially observed the rules of the institution" in which he was confined, *see* 18 U.S.C. § 4206(a) (1982); if he did not, the Commission could require him to serve more of his eight-year sentence.

In setting petitioner's presumptive release date, the regional Commissioner applied guidelines which focused upon the severity of the petitioner's offense and his parole prognosis. These parole guidelines classified the severity of his offense as "Greatest I," a severity rating surpassed only by the "Greatest II" rating given to crimes such as murder and air piracy. The severity rating was high because at the time petitioner committed his crime he possessed a managerial interest in more than fifty grams of 100% pure opiate.[5] The guidelines gave petitioner a "very good" parole prognosis because his perfect eleven "salient factor score," calculated by weighing offender characteristics such as a history of criminal convictions, previous incarceration, and drug dependency, indicated that he would pose no risk to society if released. According to the guidelines, an inmate with an offense severity rating of "Greatest I" and a salient factor score of eleven was to serve a term somewhere between forty to fifty-two months. The regional Commissioner set petitioner's term at fifty-two months.[6]

Petitioner appealed this decision to the Commission's National Appeals Board. He contended that the regional Commissioner's decision should have been based on the offense severity rating in effect at the time he committed his crime rather than the one currently in effect. The earlier offense rating, repealed in mid-1979,[7] would have assessed the seriousness of petitioner's crime on the basis of the street value of the drugs he possessed, not on the basis of the purity of those drugs and his managerial interest therein. Thus, because his drugs had a street value of less than $100,000, petitioner's crime would have been classified as "Very High," not "Greatest I." A "Very High" offense rating, combined with a salient factor score of eleven, would have called for petitioner to be incarcerated for a period between twenty-six to thirty-six months.

The National Appeals Board affirmed the regional Commissioner's decision, and petitioner, having exhausted his administrative remedies, brought these habeas corpus proceedings in the district court. Petitioner sought an order requiring the Commission to give him a presumptive parole date within the time frame specified in the guidelines in effect when he committed his

---

**4.** The nine-member U.S. Parole Commission has been structured as follows at all times relevant here: five members in addition to performing the duties assigned to the full Commission, e.g., promulgating guidelines, serve as regional Commissioners and make most of the initial parole decisions; three members, also in addition to performing the duties assigned to the full Commission, serve as the National Appeals Board which, *inter alia*, reviews the parole decisions of the regional Commissioners. *See generally,* 18 U.S.C. §§ 4202, 4203(c)(1), (4), 4204(a)(5) (1982).

**5.** Although petitioner pled to and was found guilty only of conspiracy to import cocaine, his possession of eight pounds of highly pure opium formed the basis for the severity rating. *See* 28 C.F.R. § 2.19 (1979). Petitioner does not question the Commission's consideration of this possession in determining the severity rating.

**6.** The regional Commissioner could have set petitioner's release date above or below that indicated by the guidelines, however. *See infra* at p. 1548 & note 16. The Commissioner later accelerated petitioner's presumptive release date by six months for reasons unimportant to this appeal. Petitioner has served approximately 40 months of his sentence and is currently released on bail pending this appeal.

**7.** 44 Fed.Reg. 26540–48 (May 4, 1979).

crime. Petitioner's sole complaint was that the Commission, in applying the current guidelines, retroactively enhanced the punishment for his crime, thereby violating the ex post facto prohibition found in article 1, section 9, clause 3, of the Constitution. The parties consented to the trial of the case before a U.S. Magistrate. *See* 28 U.S.C. § 636(c) (1982). The magistrate agreed with petitioner and granted the relief he sought. The district court, on appeal, *id.*, reversed, concluding that the parole guidelines the Commission applied in petitioner's case neither deprived him of any pre-existing right nor enhanced his sentence; rather, they merely aided the Commission in the exercise of its decision making. Petitioner took this appeal from the district court's decision.

## II.

■ The ex post facto clause at issue commands that "[n]o ... ex post facto law shall be passed." U.S. Const. Art. I, § 9, cl. 3.[8] An ex post facto law possesses three characteristics: it is a criminal[9] or penal measure, retrospective, and disadvantageous to the offender because it may impose greater punishment. *Weaver v. Graham,* 450 U.S. 24, 28–29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981); *Dobbert v. Florida,* 432 U.S. 282, 292–93, 97 S.Ct. 2290, 2297–98, 53 L.Ed.2d 344 (1977). *See Paschal v. Wainwright,* 738 F.2d 1173, 1175 (11th Cir.1984). A law which is merely procedural and does not add to the quantum of punishment, however, cannot violate the ex post facto clause even if it is applied retrospectively. *Weaver,* 450 U.S. 24, 29 n. 12, 101 S.Ct. 960, 964 n. 12, 67 L.Ed.2d 17 (1981); *see Dobbert,* 432 U.S. 282, 293, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977) ("[e]ven though it may work to the disadvantage of a defendant, a procedural change is not *ex post facto.*"). *See also Thompson v. Missouri,* 171 U.S. 380, 18 S.Ct. 922, 43 L.Ed. 204 (1898); *Hopt v. Utah,* 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884).

■ When subjecting a law to ex post facto scrutiny, courts should bear in mind the related aims of the ex post facto clause: providing fair notice of which acts will subject the perpetrator to criminal sanctions,[10] and preventing vindictive criminal legislation.[11] We are guided by these principles

---

**8.** For a brief history of the ex post facto clauses, U.S. Const. Art. I, § 10, cl. 1 and U.S. Const. Art. I, § 9, cl. 3, *see* J. Nowak, R. Rotunda, & J. Young, Handbook on Constitutional Law 434–36 (1978); *Warren v. United States Parole Comm'n,* 659 F.2d 183, 186–89 (D.C.Cir.1981).

**9.** Some support exists for the view that the framers intended the ex post facto prohibition to apply to civil as well as criminal laws. *See* Crosskey, *The True Meaning of the Constitutional Prohibition of Ex-Post Facto Laws,* 14 U.Chi.L. Rev. 539 (1947). Modern courts have applied the ex post facto clauses solely to criminal legislation. *Warren,* 659 F.2d at 187 n. 15; *see also, Harisiades v. Shaughnessy,* 342 U.S. 580, 594–95, 72 S.Ct. 512, 521–22, 96 L.Ed. 586 (1952).

**10.** "Critical to relief under the *Ex Post Facto* clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." *Weaver,* 450 U.S. at 30, 101 S.Ct. at 965.

In a society committed to liberty and not governed by orthodoxy the presumption must be that acts not specifically prohibited are permitted. Such a presumption guarantees that the citizenry may feel secure in acting in reliance on existing law and assures that fair notice will be given of any change. *Warren,* 659 F.2d at 188.

**11.** "From the outset ... the ex post facto clauses have been understood to have been principally aimed at curtailing legislative abuses." *Warren,* 659 F.2d at 187. *See* The Federalist No. 44, at 351 (J. Madison); Note, *Ex Post Facto Limitations on Legislative Power,* 73 Mich.L.Rev. 1491 (1975). Justice Chase states that the ex post facto prohibition

very probably arose from the knowledge, that the parliament of Great Britain claimed and exercised a power to pass such laws .... The acts were legislative judgments; and an exercise of judicial power .... With very few exceptions, the advocates of such laws were stimulated by ambition, or personal resentment and vindictive malice. To prevent such and similar acts of violence and injustice, I believe, the federal and state legislatures were prohibited from passing any ... *ex post facto* law.

*Calder v. Bull,* 3 U.S. (3 Dall.) 386, 389, 1 L.Ed. 648 (1798) (citing notorious ex post facto legislation passed by the British Parliament).

as we determine whether petitioner has presented an ex post facto violation.

The second characteristic of an ex post facto law is concededly present in this case; the guidelines applied retrospectively to petitioner. The first and third characteristics are not present, however; the guidelines neither worked to petitioner's detriment nor constituted a criminal or penal law.

The federal sentencing statute under which petitioner received his modified sentence, 18 U.S.C. § 4205(b)(2) (1982), was enacted as a "medical model" sentencing provision.[12] The sentencer was to utilize the fully indeterminate prison term, prescribed by the statute, primarily for the purpose of rehabilitating the defendant; the parole commission, as "doctor," would monitor the defendant's response to treatment, decide when he was cured, and then release him.[13]

In 1976, the Congress, having grown dissatisfied with this medical model sentencing scheme for several reasons, passed the Parole Commission and Reorganization Act (the Parole Act or Act).[14] The Act reconstituted the parole authority as the U.S. Parole Commission, abolished the parole authority's "doctor" role, and gave it the new role of resentencer. Henceforth, the Commission, acting on essentially the same information presented to the sentencing judge,[15] would resentence the defendant for the purposes of punishment, general deterrence and specific deterrence. Rehabilitation would not be one of the Commission's resentencing objectives; any rehabilitation an offender might obtain would be a coincidental result of his incarceration.

The Parole Act instructed the Commission to carry out a "national parole policy" and to promulgate guidelines to aid it in making parole decisions. 18 U.S.C. § 4203(a)(1) (1982). Following this directive, the Commission promulgated guidelines for the announced purpose of promoting "a more consistent exercise of discretion, and enabling fairer and more equitable decision-making without removing individual case consideration." 28 C.F.R. § 2.20 (1979).

The Act requires the Commission, in deciding whether to grant parole, to consider "the nature and circumstances of the [prisoner's] offense and the history and characteristics of the prisoner" and its guidelines. 18 U.S.C. § 4206(a) (1982). The Commission's guidelines speak to "the nature and circumstances of the [prisoner's] offense"

---

12. In addition to 18 U.S.C. § 4205(b)(2) (1982), examples of "pure" medical model federal sentencing statutes include the Narcotic Addicts Act, 18 U.S.C. §§ 4251–55 (1982); The Federal Youth Corrections Act, 18 U.S.C. §§ 5005–26 (1982); and the Juvenile Delinquency Act, 18 U.S.C. §§ 5031–42 (1982). These statutes were fashioned primarily to serve the purpose of rehabilitation. 18 U.S.C. §§ 4205(a), (b)(1) (1982). Sentences which are partially indeterminate in that they set a minimum time the offender must remain in prison before becoming eligible for parole consideration might be said to serve the purposes of punishment and general and specific deterrence as well as that of rehabilitation.

13. As the Supreme Court noted in *Williams v. New York,* 337 U.S. 241, 248, 69 S.Ct. 1079, 1083–84, 93 L.Ed. 1337 (1949), in commenting on the then role of the U.S. parole board, "[r]etribution is no longer the dominant objective of the criminal law. Reformation and rehabilitation of offenders have become important goals of criminal jurisprudence."

14. Act of Mar. 15, 1976, Pub.L. No. 94–233, 1976 U.S.Code Cong. & Ad.News (90 Stat.) 219 (codi- fied in various sections of 18 U.S.C. (1976)). The primary text of the Parole Reorganization Act begins at 18 U.S.C. § 4202 (1982).

15. In fact, the Commission acts on a range of information greater than that considered by the sentencing judge. *See United States ex rel. Goldberg v. Warden,* 622 F.2d 60, 84 (3d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 210, 66 L.Ed.2d 91 (1980). The Commission may consider:

(1) reports and recommendations which the staff of the facility in which such prisoner is confined may make;
(2) official reports of the prisoner's prior criminal record, including a report or record of earlier probation and parole experiences;
(3) presentence investigation reports;
(4) recommendations regarding the prisoner's parole made at the time of sentencing by the sentencing judge; and
(5) reports of physical, mental, or psychiatric examination of the offender [and] ... [s]uch additional relevant information concerning the prisoner ... as may be reasonably available.

18 U.S.C. § 4207 (1982).

by classifying it in terms of severity, and to "the history and characteristics of the prisoner" by looking to his prior criminal record, drug dependence and other "salient factors" that are presumed to indicate whether he will be a good parole risk. The Commission is bound to follow these guidelines unless there is "good cause" for not doing so. 18 U.S.C. § 4206(c) (1982).[16]

The Act cautions the Commission not to parole a prisoner if he has not "substantially observed the rules of the institution or institutions to which he has been confined," if his "release would ... depreciate the seriousness of his offense or promote disrespect for the law," or if his "release would ... jeopardize the public welfare." 18 U.S.C. § 4206(a) (1982). With this sentencing parole scheme in mind, we turn to the two ex post facto issues we must resolve: first, whether the Commission, in amending its guidelines to upgrade the severity rating of petitioner's offense from "Very High" to "Greatest II," increased his punishment; second, whether the guidelines are "laws."

### A.

■ The ex post facto clause operates to ensure that a citizen's fair notice as to what acts are criminal will not be changed after the citizen acts in reliance on that notice. When petitioner conspired to import cocaine into the United States he was on notice of the prison sentence he could

receive if convicted, the portion of that sentence he would have to serve before he would be eligible for parole, and the extent to which his period of incarceration could be reduced through gain time. *See, e.g., Weaver v. Graham,* 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981). Specifically, petitioner was on notice that, if he received the eight-year fully indeterminate sentence the court imposed, the Commission would have the discretion to parole him at any time, unless it determined *at the time it considered him for parole* that his release would "depreciate the seriousness of his offense or promote disrespect for the law" or would "jeopardize public welfare." Petitioner was also on notice that, in considering him for release, the Commission had to follow its guidelines unless "good cause" indicated otherwise.

■ Petitioner's claim that the Commission could not amend the guidelines retrospectively if the amendment would produce a longer term of incarceration implies that he was not on notice, when he committed his crime, that such an amendment could occur. In truth, petitioner was on notice that such an amendment might well occur. The Commission had a statutory duty to monitor and periodically update its guidelines and to apply current guidelines to crimes previously committed.[17] *See, e.g.,* H.Conf.Rep. No. 838, 94th Cong.2d Sess. 25, *reprinted in* 1976 U.S.Code Cong. &

---

**16.** The regulation that promulgated the guidelines, 28 C.F.R. § 2.20(c), (d), (e) (1979), indicated the breadth of the Commissioner's discretion to depart therefrom with the following language:

(c) These time ranges are merely guidelines. Where the circumstances warrant, decisions outside of the guidelines (either above or below) may be rendered.

(d) The guidelines contain examples of offense behaviors .... However, especially mitigating or aggravating circumstances in a particular case may justify a decision or a severity rating different from that listed.

(e) An evaluative sheet containing a "salient factor score" serves as an aid in determining the parole prognosis (potential risk of parole violation). However, where circumstances warrant, clinical evaluation of risk may override this predictive aid.

The Commission intended that the guidelines aid it in achieving a uniform system of parole, while retaining enough flexibility in the parole decision-making process to permit justice in each individual case.

**17.** Congress intended that the "Parole Commission ... continue to refine both the criteria which are used [in parole decision making] and the means for obtaining the information used ...." H.R.Rep. No. 94–838, 94th Cong. 1st Sess. 25–26, *reprinted in* 1976 U.S.Code Cong. & Ad.News 358–59. For example, "[t]he Parole Commission shall actively seek the counsel and comment of the corrections and criminal justice communications prior to promulgation of guidelines and shall be cognizant of past criticism of parole decision making." *Id.* at 359.

Ad.News, 335, 358–59 (in determining release Commission "shall be cognizant of the public perception of and respect for the law.") In the situation before us, the Commission determined that the street value of the narcotics an offender possessed did not reflect upon the seriousness of his drug offense as much as did the purity of the narcotics and his managerial interest in them. When he committed his crime, petitioner knew that the Commission, prior to his parole hearing, might make such a judgment call and thus lengthen any period of confinement he might have to serve. Petitioner knew, or should have known, that the role he played in his smuggling operation and the purity of the drugs involved were highly relevant to two important questions the Commission would have to decide in considering him for parole: whether his release would (1) depreciate the seriousness of his offense or promote disrespect for law and (2) jeopardize the public welfare.

Six U.S. Courts of Appeals and one U.S. Supreme Court Justice have entertained claims similar to petitioner's and have held that retrospective changes in parole guidelines do not aggravate the punishment provided for a crime. *See Portley v. Grossman,* 444 U.S. 1311, 100 S.Ct. 714, 62 L.Ed.2d 723 (1980) (Rehnquist, J., circuit justice; motion for stay); *Warren v. United States Parole Commission,* 659 F.2d 183 (D.C.Cir.1981), *cert. denied,* 455 U.S. 950, 102 S.Ct. 1454, 71 L.Ed.2d 665 (1982); *Hayward v. United States Parole Commission,* 659 F.2d 857 (8th Cir.1981), *cert.*

*denied,* 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 454 (1982); *Rifai v. United States Parole Commission,* 586 F.2d 695 (9th Cir. 1978); *Shepard v. Taylor,* 556 F.2d 648 (2d Cir.1977); *Ruip v. United States,* 555 F.2d 1331 (6th Cir.1977).[18] In *Portley,* a re-parole case, Justice Rehnquist sitting as a circuit justice, held that changes in parole guidelines do not add punishment retrospectively. He noted that the ex post facto clause does not extend to every change which may work to a defendant's disadvantage and does not limit changes in procedure which do not affect substantive rights. 444 U.S. at 1312, 100 S.Ct. at 715 (citing *Dobbert,* 432 U.S. at 293, 97 S.Ct. at 2298). Because of the discretion retained by the Commission, Justice Rehnquist held that the guideline amendments were merely procedural, no pre-existing right was impaired, and the offender's punishment was not enhanced. *Id.* at 1312–13, 100 S.Ct. at 714–15.[19]

■ In sum, the Commission's decision in this case implicated neither of the principal policies served by the ex post facto clause, to ensure that the offender is not singled out as the target of legislative retribution and that he is provided fair notice of the punishment that may be meted out if he transgresses the criminal law.

## B.

■ As the district court concluded, the Commission's guidelines are, simply, guidelines. They are not promulgated by any

---

**18.** Petitioner contends that *Portley* and *Warren* are inapposite because they deal with reparole. The analysis of the guidelines under the ex post facto clause remains the same and the logic of those decisions extends beyond the individual factual settings. Necessary to the ultimate conclusion in each of those cases, that the promulgation or amendment of parole guidelines was not the creation of an ex post facto law, was the intermediate conclusion that the guidelines did not affect the prisoner's eligibility for parole. A repeal or reduction of parole eligibility could violate the ex post facto clause, however. *See Weaver,* 450 U.S. at 33, 101 S.Ct. at 967.

**19.** Petitioner claims that relief is required by *Weaver,* 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d

17 (1981). *Weaver* dealt with an ex post facto challenge to a statute which retrospectively limited statutory prison "gain time." *Weaver* applies to this case for the principles it adds to ex post facto analysis, not for its specific holding. See our discussion of *Weaver* in a similar context, *Paschal v. Wainwright,* 738 F.2d at 1173. Petitioner also urges this court to adopt the Third Circuit's reasoning in *United States ex rel. Forman v. McCall,* 709 F.2d 852 (3d Cir. 1983) (guidelines, if applied inflexibly, could violate ex post facto clause). We have noted previously that *Forman* has been soundly rejected by federal courts which have considered the issue, *Paschal v. Wainwright,* 738 F.2d at 1180, n. 12, and this court has rejected it as not persuasive. *See id.* at 1180–81.

legislature. Rather, they are stated policy rules that show how agency discretion is likely to be exercised.[20] They do not state rules of conduct for the public. A change in the guidelines does not affect the maximum or minimum prison sentence a court may impose, the point at which the prisoner becomes eligible for parole or his mandatory release date on good time.[21] *Accord, Portley v. Grossman,* 444 U.S. 1311, 1312–13, 100 S.Ct. 714, 715, 62 L.Ed.2d 723 (1980). The guidelines merely indicate when, in most cases, the prisoner can expect release. We agree with the second, sixth, seventh, and ninth circuits that the parole guidelines do not have the force and effect of law. *Zeidman v. United States Parole Commission,* 593 F.2d 806 (7th Cir. 1979); *Rifai v. United States Parole Commission,* 586 F.2d 695 (9th Cir.1978); *Shepard v. Taylor,* 556 F.2d 648 (2d Cir.1977); *Ruip v. United States,* 555 F.2d 1331 (6th Cir.1977); *accord, Joost v. United States Parole Commission,* 535 F.Supp. 71 (D.Kan.1982); *Kirby v. United States,* 463 F.Supp. 703 (D.Minn.), *vacated on other grounds,* 600 F.2d 146 (8th Cir.1979); *Wilson v. United States Parole Commission,* 460 F.Supp. 73 (D.Minn.1978). As the Sixth Circuit stated:

> [W]hat is involved in this case is not agency interpretation of law but an agency's setting up guidelines for itself to assure the uniform execution of its business. These guidelines are not law, but guideposts which assist the Parole Commission ... in exercising its discretion. Nor do these guidelines have the characteristics of law. They are not filed and rigid, but are flexible. The Commission

remains free to make parole decisions outside of these guidelines.
*Ruip,* 555 F.2d at 1335.

 Even a showing that the Commission adhered to the guidelines in the vast majority of cases [22] would not necessarily prove that the guidelines were law; otherwise, every policy that an agency adhered to consistently would become a law from which the agency could not vary. *Accord, Rifai,* 586 F.2d at 698. Congress intended that the Commission periodically amend the guidelines to reflect contemporary views concerning the seriousness of given crimes and parole recidivism. *E.g.,* S.Rep. No. 369, 94th Cong., 2d Sess. 18, *reprinted in* 1976 U.S.Code Cong. & Ad. News 335. Such amendments are not indicative of provisions which have the force and effect of law. As the legislative history shows, "[t]he standards for release on parole [in the Parole Act] ... are not changed from [prior] law." *Id.* at 339. The Commission may follow its guidelines, disregard them, or change them. Parole remains an act of discretion. *See, e.g., Shahid v. Crawford,* 599 F.2d 666, 669 (5th Cir.1979); *Brown v. Lundgren,* 528 F.2d 1050, 1055 (5th Cir.), *cert. denied,* 429 U.S. 917, 97 S.Ct. 308, 50 L.Ed.2d 283 (1976).

Because the guidelines in question are not criminal laws and their amendment did not add to the punishment prescribed for petitioner's crime, petitioner has failed to establish two of the requisite elements of an ex post facto claim. Accordingly, the judgment of the district court denying his claim is

AFFIRMED.

---

**20.** We are not persuaded that the guidelines constitute "laws" under the ex post facto clause merely because they could come under the rulemaking provisions of the Administrative Procedures Act. *See, e.g., Pickus v. United States Board of Parole,* 507 F.2d 1107 (D.C.Cir.1974) (promulgation of guidelines before Parole Reorganization Act subject to Administrative Procedures Act).

**21.** In this case we are not dealing with curtailed parole *eligibility.* Thus, *United States ex rel. Graham v. United States Parole Commission,* 629 F.2d 1040 (5th Cir.1980), is inapposite and does not support petitioner's case. *Graham* ad-

dressed a parole regulation, 28 C.F.R. § 2.14(a) (1978), not in issue here. The *Graham* court of appeals remanded the case to the district court and stated that the regulation could be an ex post facto law if it substantially diminished or eliminated the prisoner's eligibility for parole. 629 F.2d at 1044. The parole guidelines at issue here did not affect petitioner's parole eligibility. Parole eligibility is determined by the sentence imposed by the trial court.

**22.** The Commission may deviate from the guidelines for "good cause." 18 U.S.C. § 4206(c) (1982).