William J. PRATER,
Petitioner-Appellant,

v.

U.S. PAROLE COMMISSION and
Thomas Keohane, Warden,
Respondents-Appellees.

No. 84–1121.

United States Court of Appeals,
Seventh Circuit.

Reargued En Banc June 9, 1986.

Decided Oct. 3, 1986.

James J. Barrett, Pine Ridge, Ky., for petitioner-appellant.

John D. Tinder, U.S. Atty. (Carolyn N. Small, Asst. U.S. Atty., Indianapolis, Ind., on brief), Indianapolis, Ind., for respondents-appellees.

Before BAUER, Chief Judge, CUMMINGS, WOOD, CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, and RIPPLE, Circuit Judges, and SWYGERT, Senior Circuit Judge.

POSNER, Circuit Judge.

This appeal from the denial of a petition for habeas corpus requires us to consider the constitutional prohibition against ex post facto laws. In 1969, on New Year's Eve, Joseph Yablonski, a dissident official of the United Mine Workers union, was murdered along with his wife and daughter on the orders of the union's president. Yablonski's prominence, the motivation for the killings, and the murder of family members along with the prime target gave the incident unusual notoriety. See, e.g., Armbrister, Act of Vengeance: The Yablonski Murders and Their Solution (1975); Lewis, Murder by Contract: The People v. "Tough Tony" Boyle (1975); *A Deadly Venom*, Time, Jan. 19, 1970, at 19; *Death of a Rebel*, Newsweek, Jan. 19, 1970, at 22. In 1973 William Prater, a union official who was one of the three men who had conspired to assassinate Yablonski—his role being to transfer union pension funds to the triggerman in payment for the assassination—pleaded guilty to conspiracy to injure a United States citizen in the exercise of his federal rights, in violation of 18 U.S.C. § 241, and was sentenced to life in prison. See *id.* Under federal law he was eligible for parole after serving ten years. 18 U.S.C. § 4205(a). Because of Prater's age (63 when he became eligible for parole), and because he was a model prisoner and had no prior convictions and no history of drug abuse, he might have been paroled upon first becoming eligible, had it not been for the notoriety of his crime. Instead the Parole Commission ruled that "release at this time would depreciate the severity of your offense behavior," and it pushed off his presumptive parole date to 1988. Under the Parole Commission and Reorganization Act of 1976, which the Commission applied to Prater's case even though he had committed the crime before 1976, an inmate "shall be released" if the Parole Commission determines that his release "would not depreciate the seriousness of his offense or promote disrespect for the law" and "would not jeopardize the public welfare." 18 U.S.C. § 4206(a).

Prater sought habeas corpus, contending that the ground on which his request for parole had been denied had come into the law after he had committed his crime and

therefore could not be used to deny him parole without violating the ex post facto clause in Article I, section 9 of the Constitution. The parole law in force in 1969 (unchanged in essentials since the Act of June 25, 1910, ch. 387, § 3, 36 Stat. 819 (1910)) provided that "if it appears to the Board of Parole [as the Parole Commission was then called] ... that there is a reasonable probability that such prisoner will live and remain at liberty without violating the laws, and if in the opinion of the Board such release is not incompatible with the welfare of society, the Board may in its discretion authorize the release of such prisoner on parole." 18 U.S.C. § 4203(a) (1970 ed.). The government moved to dismiss the petition for habeas corpus and Prater countered with a motion for judgment on the pleadings. The district court granted the government's motion and Prater appealed. A panel of this court ordered the case remanded to the district court for a factual inquiry into whether Prater would have been denied parole under the statute in force in 1969. 764 F.2d 1230 (7th Cir. 1985). The government petitioned for rehearing en banc, and we granted the petition.

As the panel majority noted, "It seems implausible that the perpetrator of a grave and notorious crime could operate under a serious misapprehension that a parole board, armed with broad discretion, would fail to consider the public ramifications of his premature release from prison—whatever the formal state of the applicable statutes or guidelines." Id. at 1239. "Nevertheless," the majority added, "it may in fact be so," and remanded to give Prater an opportunity to show that the change in the parole statute had "clearly and significantly reduced" "his expectations of release at a certain time." Id. Yet at the en banc argument Prater's counsel made clear that he did not want an opportunity to make such a showing, in the district court or anywhere else. He acknowledged that the 1976 statute had merely codified the practice of the Parole Commission (as we shall call both the Commission and its predecessor) under guidelines that had been issued in 1973 to guide its administration of the old statute. "The promulgation of guidelines to make parole less disparate and more understandable has met with such success that this legislation [i.e., the 1976 act] incorporates the system into the statute, removes doubt as to the legality of changes implemented by administrative reorganization, and makes the improvements permanent." H.R. Conf. Rep. No. 838, 94th Cong., 2d Sess. 20 (1976), U.S. Code Cong. & Admin. News 1976, pp. 335, 353. And the 1973 guidelines had provided that "the reasons for parole denial may include, but are not limited to ... (1) Release at this time would depreciate the seriousness of the offense committed and would thus be incompatible with the welfare of society." 28 C.F.R. § 2.13(b) (1974).

The guidelines may seem not to forbid the Commission to grant parole where parole would depreciate the seriousness of the offense but merely to allow the Commission to deny parole on that ground, although it is obvious that no agency authorized to deny parole on that ground would fail to do so if the ground were present; no responsible parole commission could take the position that while releasing the prisoner would be incompatible with the welfare of society, he should be released anyway. This weird possibility is in any event foreclosed by another provision of the guidelines—"The [Commission] may parole a prisoner who is otherwise eligible if (a) in the opinion of the Board such release is not incompatible with the welfare of society," 28 C.F.R. § 2.18 (1974)—as well as by the parallel language of the underlying statute ("if in the opinion of the [Commission] such release is not incompatible with the welfare of society, the [Commission] may in its discretion authorize the release of such prisoner on parole," 18 U.S.C. § 4203(a) (1970 ed.). Since a grant of parole that would depreciate the seriousness of the prisoner's offense would be incompatible with the welfare of society (§ 2.13(b)(1)), the Commission could not parole a prisoner if to do so would depreciate the seriousness of the offense.

In stating that "whereas the 1973 guidelines permitted the Parole [Commission] to consider depreciation of the seriousness of the offense (thereby perhaps just codifying prior practice), Congress made that criterion a precondition of parole in the new act," 764 F.2d at 1233, the panel that first heard this appeal apparently was misled by a subsequent change in the guidelines; for the language it quotes to show that the guidelines merely permitted the Commission to consider the seriousness of the offense, language that is from the 1981 edition of the Code of Federal Regulations and lacks the critical equation of depreciating the seriousness of the offense to being incompatible with the welfare of society, see *id.* at 1233 and n. 2, is not the language of the 1973 guidelines. When sections 2.13(b)(1) and 2.18 of those guidelines are read together (and with 18 U.S.C. § 4203(a) (1970 ed.)), there can be no doubt that the 1973 guidelines required the Commission to deny parole if granting parole would depreciate the seriousness of the prisoner's offense. The guidelines define a grant of parole that would depreciate the seriousness of the offense as incompatible with the welfare of society, and the guidelines and the statute forbid any grant of parole that would be incompatible with that welfare.

It is therefore no surprise that Prater's main complaint is about the guidelines, which made clear that parole must be denied if granting it would depreciate the seriousness of the prisoner's offense, rather than about the 1976 statute, which did not alter the guidelines and hence did not affect the decision not to parole him. But he has an uphill fight in attacking the guidelines as an ex post facto law. No member of the original panel questioned the proposition, stated in many cases (including two by this court), that the prohibition against ex post facto laws is not violated by applying more severe parole guidelines than those in force when the crime was committed. See, e.g., *Portley v. Grossman,* 444 U.S. 1311, 100 S.Ct. 714, 62 L.Ed.2d 723 (1980) (Rehnquist, J., in chambers); *Inglese v. United States Parole*

*Comm'n,* 768 F.2d 932, 934–39 (7th Cir. 1985); *Zeidman v. United States Parole Comm'n,* 593 F.2d 806, 808 (7th Cir.1979); *Yamamoto v. United States Parole Comm'n,* 794 F.2d 1295, 1297–98 (8th Cir. 1986) (per curiam); *DiNapoli v. Northeast Regional Parole Comm'n,* 764 F.2d 143, 146–47 (2d Cir.1985); *Paschal v. Wainwright,* 738 F.2d 1173, 1180–81 (11th Cir. 1984); *Dufresne v. Baer,* 744 F.2d 1543, 1549–50 (11th Cir.1984); *Warren v. United States Parole Comm'n,* 659 F.2d 183, 195–97 (D.C.Cir.1981). Only the Third Circuit has rejected this proposition, see *Royster v. Fauver,* 775 F.2d 527, 534–35 (3d Cir.1985); *United States ex rel. Forman v. McCall,* 709 F.2d 852, 859–62 (3d Cir.1983), and even that court has held that guidelines issued by the Parole Commission in 1979 (not involved in the present case) were administered so flexibly that they could not count as a "law" for purposes of applying the ex post facto clause. *United States ex rel. Forman v. McCall,* 776 F.2d 1156, 1161–64 (3d Cir.1985).

Prater has rejected or at least downplayed the narrow ground of reversal offered him by the panel majority (that he be entitled to show that the new statute, even though it appears merely to have codified the guidelines under the old one, somehow reduced his chances for an early parole) in favor of two grounds that attracted no support from any member of the panel: the parole guidelines are "laws" within the meaning of the rule against ex post facto laws; the change in the language of the parole statute in 1976 created an ex post facto law even if it merely ratified the guidelines under the old statute.

1. The constitutional prohibition against ex post facto laws ("No ... ex post facto Law shall be passed") is directed to the legislative branch of government rather than to the other branches. This is apparent not only from the (identical) wording and placement of the two ex post facto clauses (one directed against Congress, the other against state legislatures) in Article I, which deals with the legislative power, but also from history. See, e.g., *Calder v.*

*Bull,* 3 U.S. (Dall.) 386 (1798); Note, *Ex Post Facto in the Constitution,* 20 Mich.L. Rev. 315, 317–18 (1922). In the words of Blackstone, a law is ex post facto "when *after* an action is committed, the legislator then for the first time declares it to have been a crime, and inflicts a punishment upon the person who has committed it; here it is impossible that the party could foresee that an action, innocent when it was done, should be afterwards converted to guilt by a subsequent law; he had therefore no cause to abstain from it; and all punishment for not abstaining must of consequence be cruel and unjust." 1 Commentaries on the Laws of England 46 (1765) (emphasis in original). Or as Hamilton put it in Federalist No. 78, "By a limited Constitution, I understand one which contains certain specified exceptions to the legislative authority; such, for instance, as that it shall pass ... no *ex-post-facto* laws." If judges get tougher on crime by meting out stiffer sentences or resolving more close procedural questions against criminal defendants, or prosecutors drive harder plea bargains, or the Parole Commission takes a more jaundiced view of applications for parole, the ex post facto prohibition is not violated, even though a criminal's punishment may end up being longer or harsher than he hoped when he committed the crime.

There are several reasons, besides constitutional text and history, for confining the ex post facto clauses to legislative functions and thus for excluding administrative guidelines issued by an executive agency such as the Parole Commission:

■ a. Because few statutes are completely self-enforcing, it is inevitable that executive, judicial, and administrative officers will have some discretion with regard to interpretation or enforcement and therefore that the severity of enforcement will vary over the life of the statute. The risk of such variance is inherent in the decision to commit a crime; it cannot feasibly be eliminated. If whenever law enforcement becomes more severe one of the ex post facto clauses is violated, then whatever degree of mildness or severity enforcement officials adopt will be the ceiling on what their successors can do; the discretion of enforcers will be truncated. And imagine the turmoil that would be created if every time a court reinterpreted a criminal statute the new interpretation was subject to attack as an ex post facto law. See Note, *Ex Post Facto Limitations on Legislative Power,* 73 Mich.L.Rev. 1491, 1492 n. 6 (1975). This result is not necessary in order to protect the expectations of persons who are considering whether to engage in conduct that may be deemed criminal. For by requiring fair warning of potential criminal liability, the due process clauses prevent courts from achieving by unforeseeable interpretations of an existing criminal statute what the legislature could not achieve (because of the rule against ex post facto laws) by writing the interpretations into a new statute and applying it retroactively. See, e.g., *Marks v. United States,* 430 U.S. 188, 191–92, 97 S.Ct. 990, 992–93, 51 L.Ed.2d 260 (1977); *Bouie v. City of Columbia,* 378 U.S. 347, 353–54, 84 S.Ct. 1697, 1702–03, 12 L.Ed.2d 894 (1964). We shall see that there is no lack of fair warning in this case.

■ b. The rule against ex post facto laws has two purposes. One is to allow people to go about their business without fear that their behavior, though noncriminal when engaged in, will subject them to punishment. The other (of which more later) is to keep legislatures out of the business—which is judicial business—of punishing people, cf. *Weaver v. Graham,* 450 U.S. 24, 29 and n. 10, 101 S.Ct. 960, 964 and n. 10, 67 L.Ed.2d 17 (1981); this purpose links the rule against ex post facto laws to the prohibition, in the same clauses, of bills of attainder. By extension, the rule against ex post facto laws also protects people from retroactive increases in the punishment prescribed for criminal behavior, see, e.g., *Ex parte Medley,* 134 U.S. 160, 171, 10 S.Ct. 384, 387, 33 L.Ed. 835 (1890), including statutory changes in entitlement to early release, see *Weaver v. Graham, supra.* The extension from crime to punishment is

based on the realistic proposition that behavior is influenced not only by whether a proposed course of action is criminal but also by the severity of the punishment prescribed for it. But if all that has changed is the vigor with which the criminal laws are being enforced, reliance is unlikely and the ex post facto argument fails. Settled expectations regarding the vigor of enforcement are unreasonable. No one thinks that if the police step up their patrolling of a highway so that the probability of being caught for speeding is much greater, speeders ought to be able to appeal to the ex post facto principle to avoid being punished if they are caught under the new regime. The Constitution does not entitle people to use lapses in enforcement to escape punishment when law enforcement becomes more effective.

Pertinent here are cases such as *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 466–67, 101 S.Ct. 2460, 2465–66, 69 L.Ed.2d 158 (1981), which held that a practice of commuting most life sentences did not create an entitlement on which a claim of denial of due process could be based; *United States v. Addonizio,* 442 U.S. 178, 190, 99 S.Ct. 2235, 2243, 60 L.Ed.2d 805 (1979), which pointed out that "the [sentencing] judge has no enforceable expectations with respect to the actual release of a sentenced defendant short of his statutory term"; and the many cases which have held that statutory changes that merely shift the balance of procedural advantages a little against the defendant can be applied retroactively without becoming ex post facto laws. See, e.g., *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977); *United States v. Molt,* 758 F.2d 1198, 1200–01 (7th Cir.1985); Note, *supra,* 73 Mich.L.Rev. at 1506–16. The decision whether to commit a crime (or which crime to commit) is unlikely to be much influenced by the details of the criminal justice system; the prospect of an early parole cannot have been what made the difference to Prater's decision to join the lethal conspiracy against Yablonski.

There is an element of unreality, as well as circularity, in trying to determine the scope of the ex post facto principle by reference to expectations. The more narrowly the principle is defined, the fewer expectations are reasonable; the more broadly it is defined, the more are reasonable; if one asks what expectations are reasonable in the absence of rules against ex post facto laws, the inquiry turns subjective. See generally Easterbrook, *Due Process and Parole Decision-Making,* in Parole in the 1980's: Proceedings of the National Parole Symposium 77, 84–86 (U.S. Dept. of Justice, U.S. Parole Comm'n, 1980). The way to break the circle is to bring in the other purpose of forbidding ex post facto laws—that of keeping the legislature from getting involved in the executive and judicial functions of prosecuting and punishing past acts. That is a reason why the legislature may not increase the punishment for an existing crime retroactively, but it is not a reason for treating parole guidelines as laws to which the rule against ex post facto laws applies.

c. Applying the rule to changes in parole administration would make the rule indefinite and would discourage the formulation and publication of administrative policies. Every criminal case would become an inquest into the history of enforcement of the statute under which the criminal had been punished, and government agencies would be penalized for codifying their practices. Prater makes the parole guidelines issued in 1973 the fulcrum for his claim that he is being punished under an ex post facto law; without the guidelines he would have no case at all. Yet the Commission issued the guidelines in response to criticisms that its lack of published criteria had led to arbitrary decisions. See, e.g., National Advisory Comm'n on Criminal Justice Standards and Goals, Task Force Report: Corrections 418 (1973); Stanley, Prisoners Among Us: The Problem of Parole 50–66 (1976); von Hirsch & Hanrahan, Abolish Parole? 7–14 (1978); cf. Morris, The Future of Imprisonment 28–43 (1974).

The rule against ex post facto laws applies to statutory changes and also

(we may assume) to changes in administrative regulations that represent an exercise of delegated legislative authority, as opposed to an interpretation of legislation by an agency authorized to execute, not make, laws. See, e.g., *Rodriguez v. United States Parole Comm'n*, 594 F.2d 170, 173–74 (7th Cir.1979); *United States ex rel. Graham v. United States Parole Comm'n*, 629 F.2d 1040, 1043 (5th Cir.1980). The legislature should not be allowed to do indirectly what it is forbidden to do directly. Thus if Congress authorizes an agency to make rules governing procedure before the agency (as in section 713(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-12(a)), and the agency does so, the rules are as if made by Congress; Congress could have made them, if it had had time. But if the Justice Department issues guidelines for the enforcement of a federal statute that it administers (as it did in the 1984 Department of Justice Merger Guidelines, for example), this is the performance of an interpretive function that every law enforcement agency has; it is not the enactment of a law. See *General Electric Co. v. Gilbert*, 429 U.S. 125, 141–42, 97 S.Ct. 401, 410–11, 50 L.Ed.2d 343 (1976); 2 Davis, Administrative Law Treatise § 7:8 (2d ed. 1979). If the law is unchanged and no legislative regulations are promulgated, a mere change in enforcement methods, priorities, or policies, written or unwritten—a change within the scope of the executive branch's discretion in enforcing the laws passed by Congress—does not activate the prohibition against ex post facto laws.

■ The relevant provisions of the 1973 guidelines, in contrast to the procedural regulation involved in our *Rodriguez* case, àre interpretive rather than legislative. They are not the exercise of delegated authority (e.g., to make rules of procedure); they are statements of enforcement policy. They are, as we have said of the guidelines under the 1976 statute, "merely guides, and not laws: guides may˙ be discarded where circumstances require; laws may not." *Inglese v. United States Parole Comm'n, supra*, 768 F.2d at 936. Any doubt on this score regarding the 1973

guidelines is dispelled by the provision of those guidelines that "the granting of parole rests in the discretion of the [Parole Commission]." 28 C.F.R. § 2.18 (1974).

2. If the guidelines (at least so far as relevant to this case) are not laws within the meaning of the ex post facto clauses, all we should have to do to decide this case is compare the parole statute in force in 1969 with the statute enacted in 1976 under which Prater was denied parole. The statutes are not worded identically but that cannot be decisive. Obviously if the 1976 statute had relaxed the conditions for obtaining a parole Prater could not complain about the application of the new statute to him. The same must be true if the new statute, while worded differently, does not make the conditions of parole more onerous but simply more general or more specific. See *Raimondo v. Belletire*, 789 F.2d 492, 495–96 (7th Cir.1986); *Damiano v. Florida Parole & Probation Comm'n*, 785 F.2d 929, 933 (11th Cir.1986) (per curiam); *Johnson v. Wainwright*, 772 F.2d 826 (11th Cir.1985) (per curiam); *Burnside v. White*, 760 F.2d 217, 222–23 (8th Cir.1985).

The old parole statute provided that if the Parole Commission thinks it reasonably probable that the prisoner will live and remain at liberty without violating the laws, and also that releasing him would not be "incompatible with the welfare of society, the [Commission] may in its discretion authorize" his release. The new statute provides that the prisoner "shall be released" if release "would not depreciate the seriousness of his offense or promote disrespect for the law" and "would not jeopardize the public welfare." No one just reading these two statutes would think the second more restrictive than the first. The first reserves to the Commission discretion not to release the prisoner even if he meets the statutory conditions for parole; the second makes parole mandatory provided the statutory conditions are met. *Solomon v. Elsea*, 676 F.2d 282, 285 (7th Cir.1982) (per curiam). The conditions are slightly different but if anything the second statute is more liberal, in entitling the prisoner to

parole if certain conditions are met rather than putting him entirely at the mercy of the parole authorities. The new statute considered as a whole is not harsher than the old. See *Dobbert v. Florida, supra,* 432 U.S. at 294, 97 S.Ct. at 2298–99. Indeed, since the old statute speaks in terms of discretion rather than entitlement, it is hard to see how Prater can argue that the application of the new statute defeats any reasonable expectation that he might have built upon the old.

He claims that the express reference to "depreciat[ing] the seriousness of his offense" shows that a new element was added in 1976 (the element responsible for the Commission's decision not to parole him). But the element is implicit in the old statute if one attends carefully to the two conditions that the prisoner had to satisfy under that statute in order to be allowed to appeal to the Commission's discretion. The first is that the prisoner will not commit more crimes—he is rehabilitated. The interest in rehabilitation is closely related to that in incapacitation. Continued imprisonment prevents the prisoner from committing any crimes he would have committed during this period if released; that is incapacitation. Rehabilitation implies that he has learned his lesson and will commit no further crimes after his release. Prater argues as if the first condition in the old statute were the only one; he is rehabilitated, ergo he should be released. He ignores the second condition—that his release not be incompatible with the welfare of society. The second condition is not redundant. Its language invokes considerations not of rehabilitation and incapacitation but of deterrence and retribution—considerations related to creating disincentives to commit crime and providing a catharsis for society's indignation at the criminal's act.

The 1976 statute rearranged all these elements. It expresses the interests in incapacitation and rehabilitation in terms of "not jeopardiz[ing] the public welfare"; the interest in retribution in terms of not "depreciat[ing] the seriousness of his offense"; and the interest in general deterrence in terms of not "promot[ing] disrespect for the law." See H.R. Conf. Rep. No. 838, *supra,* at 25–26, U.S.Code Cong. & Admin. News 1976, p. 358. These are changes of form rather than substance; "the present statutory criteria utilized by the Federal parole authorities in making their decision as to whether or not to grant parole are preserved" in the 1976 act. S.Rep. No. 369, 94th Cong., 1st Sess. 23 (1975), U.S.Code Cong. & Admin.News 1976, p. 344.

The clincher is the 1973 guidelines. They have never been attacked successfully as inconsistent with the old statute even though they compel consideration of the gravity of the offense; on the contrary, their conformity with it has been upheld a number of times. See, e.g., *Hayward v. United States Parole Comm'n,* 659 F.2d 857, 862 (8th Cir.1981); *Rifai v. United States Parole Comm'n,* 586 F.2d 695, 698 (9th Cir.1978); *Ruip v. United States,* 555 F.2d 1331, 1335 (6th Cir.1977). We said earlier that these are interpretive guidelines; and one of the things they interpret is the statutory phrase (in the statute in force when Prater committed his crime) "the welfare of society." They interpret it to mean that parole not depreciate the seriousness of the prisoner's offense; that is the equation made in 28 C.F.R. § 2.13(b)(1) (1974). The interpretation of a statute by the agency charged with enforcing it is entitled to weight. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The interpretation in section 2.13(b)(1) links the old statute to the new and shows that, at least so far as pertains to this case, they have the same meaning.

3. The last issue we need consider, the issue that was the focus of the panel majority's opinion, is whether Prater should have a chance to show that the new statute as administered is harsher than the old statute as administered. This is a comparison both difficult to make by the methods of litigation and foreign to the purposes of prohibiting ex post facto laws. No one contemplating criminal activity should be encouraged to rely on the practices of judges, prosecutors, prison officials, or pa-

role boards; that is not the sort of reliance that the prohibition against ex post facto laws ought to protect or does protect. The parole-guideline and procedural-change cases cited earlier show this, as do *Holguin v. Raines*, 695 F.2d 372, 374 (9th Cir.1982) (attorney general's interpretation of statute), and *Glynn v. Auger*, 678 F.2d 760, 761 (8th Cir.1982) (per curiam) (double-celling of inmates)—illustrative cases where the prohibition was held inapplicable to nonlegislative actions that retroactively increased the severity of punishment. Although a legislature might be tempted to delegate legislative functions to executive, administrative, or judicial officers in order to get around the prohibition against ex post facto laws, or to enact a vague statute, we shall worry about these dangers (which are partly held in check by the due process clauses as interpreted in *Marks* and *Bouie*) if and when they materialize. They are not dangers in this case; Prater does not argue that the old act either delegates too much power to the Parole Commission or is too vague. Hence it should be enough that under that act the Commission could have refused to parole someone because of the enormity of his crime, even if he was completely rehabilitated, and as harmless as a white mouse; it is unnecessary to add that, on occasion, it did so, as the guidelines under the act required it to do. See *Garcia v. United States Board of Parole*, 557 F.2d 100, 105–06 (7th Cir.1977), where we upheld such a denial of parole as consistent with the old act. The fact that the Commission may not often have denied parole because of the enormity of the crime would not entitle a prisoner to be paroled regardless of that enormity. In the nature of things, such power is unlikely to be exercised often; crimes as outrageous as Prater's are not committed often.

It is true that in *Heirens v. Mizell*, 729 F.2d 449, 457–65 (7th Cir.1984), we inquired into the actual practice under the old Illinois parole statute (which was similar to the old federal statute) and found it consistent with the new. That cooked the petitioner's goose; but to draw the negative inference that if the practice had been

different the state would have lost is unwarranted. *Heirens* cited with approval the district court's decision in the present case, noting that it had "denied a similar *ex post facto* claim against the federal Parole Commission on grounds in accord with the present case." *Id.* at 464 n. 17.

Even if we must consider the Commission's actual behavior under the old statute, there is adequate evidence that parole was denied when the offense was so egregious that paroling the offender would outrage the community. See, e.g., Gottfredson, et al., *Making Paroling Policy Explicit*, 25 Crime & Delinquency 34, 37 (1975), and Kastenmeier & Eglit, *Parole Release Decision-making: Rehabilitation, Expertise, and the Demise of Mythology*, 22 Am.U.L.Rev. 477, 508, 516 (1973), as well as our decision in *Garcia*, 557 F.2d at 105–06, and a number of similar decisions illustrated by *Hill v. Attorney General*, 550 F.2d 901 (3d Cir.1977) (per curiam). Of course this comes as no surprise, since the 1973 guidelines prefigure the 1976 act; it is however noteworthy that the Kastenmeier & Eglit study refers to the period before the guidelines were promulgated. It doesn't take too much imagination to realize that parole boards that have the authority not to release notorious criminals at the earliest possible opportunity will exercise it. See Dawson, *the Decision to Grant or Deny Parole: A Study of Parole Criteria in Law and Practice*, 1966 Wash.U.L.Q. 243, 283–84, 300. It is true that the original philosophy of parole was rehabilitative and that before 1973 the Parole Commission gave greater weight to rehabilitative than retributive considerations, though little is known about that period because of the lack of guidelines and the summary character of the parole process. See Comment, *Curbing Abuse in the Decision to Grant or Deny Parole*, 8 Harv.Civ.Rts.-Civ.Lib.L.Rev. 419, 428–29 (1973); Curtis, *Federal Judicial Power, Parole Guidelines, and Sentence Reform*, in 2 Prisoners' Rights Sourcebook 91, 102 (Robbins ed. 1980); Gottlieb, *Federal Parole and Federal Sentencing: A Report on the Present*

*and Some Thoughts for the Future,* 13 Loyola (Chi.) L.Rev. 669, 671–75 (1982). But "the Commission did not ignore the severity of the inmate's offense ...," *id.* at 673; see Chappell, *Federal Parole,* 37 F.R.D. 207, 210 (1964); cf. *Warren v. United States Parole Comm'n, supra,* 659 F.2d at 190, 193. One study of parole under the old statute found "that the primary concerns were severity of offense, parole prognosis, and institutional behavior," and that "a parole board's decision could be predicted fairly accurately by knowledge of its ratings of these three factors." Gottfredson, et al., *supra,* at 37 (footnote omitted). Prater was denied parole because of the severity of his offense. The statute in force when he committed the offense, as interpreted in the 1973 guidelines and (so far as appears) as actually administered, compelled this result. Thus the 1976 statute made Prater no worse off than he would have been if the statute had never been passed. He has not been subjected to ex post facto punishment.

AFFIRMED.

CUDAHY, Circuit Judge, dissenting.

When William Prater was sentenced in 1973 to life in prison for his role in the conspiracy to murder Joseph Yablonski and his family, the relevant federal statute regarding parole read:

If it appears to the Board of Parole from a report by the proper institutional officers or upon application by a prisoner eligible for release on parole, that there is a reasonable probability that such prisoner will live and remain at liberty without violating the laws, *and if in the opinion of the Board such release is not incompatible with the welfare of society,* the Board *may in its discretion* authorize the release of such prisoner on parole....

1. Ill.Rev.Stat. ch. 38, § 1003–3–5(c) (1982) provides that an offender should not be paroled if:

(1) there is substantial risk that [he] will not conform to reasonable conditions of parole; or

18 U.S.C. § 4203(a) (1969) (emphasis supplied). When Prater applied for parole in 1982, the statute under the terms of which his application was denied provided:

If an eligible prisoner has substantially observed the rules of the institution or institutions to which he has been confined, and if the Commission, upon consideration of the nature and circumstances of the offense and the history and characteristics of the prisoner, determines:

(1) *that release would not depreciate the seriousness of his offense or promote disrespect for the law;* and

(2) *that release would not jeopardize the public welfare;*

... such prisoner *shall* be released.

18 U.S.C. § 4206(a) (1985) (emphasis supplied). Prater, whose parole was denied because "release at this time would depreciate the seriousness of your offense behavior," sought a writ of habeas corpus in federal district court on the ground that his continued detention violated the *ex post facto* clause of Article I, section 9 of the federal Constitution. The district court granted the government's motion to dismiss the petition, and on appeal a panel of this court reversed and remanded the case to the district court for a factual inquiry into the practices of the United States Parole Commission under the older statute. *Prater v. United States Parole Commission,* 764 F.2d 1230 (7th Cir.), *vacated,* 775 F.2d 1157 (7th Cir.1985). I rely substantially on that panel opinion for a detailed statement of reasons for my dissent here.

**I**

Prior to that panel decision in this case, this court had two opportunities to address closely analogous changes in the Illinois parole statute,[1] which were alleged to have

(2) his release at that time would depreciate the seriousness of his offense or promote disrespect for the law; or

(3) his release would have a substantially adverse effect on institutional discipline.

The older statute had provided only that the sentencing judge and State's Attorney should

violated the *ex post facto* prohibition of Article I, section 8. In *Welsh v. Mizell*, 668 F.2d 328 (7th Cir.), *cert. denied*, 459 U.S. 923, 103 S.Ct. 235, 74 L.Ed.2d 186 (1982), we held that a new Illinois statute, which explicitly required consideration of depreciation of offense severity, implicated the *ex post facto* clause and, as a matter of law, disadvantaged Illinois prisoners who were sentenced before the change in the statute. Thus we said:

> Criterion (2) ... is a marked departure [from the superseded parole statute], importing for the first time into the parole decision considerations of retributive justice (the relationship between time served and the nature of the offense) and general deterrence (incarceration as a means of promoting general respect for law). Furthermore, the [new] statute allows any one of the criteria to serve as a basis for parole denial. Not only is criterion (2) new, therefore, but it can also be determinative. The district court failed to realize that Welsh's petition presented exactly that case: the Parole Board gave only the second of the three factors as its reason for denying parole, and that factor could not have had decisive weight under the Board's [old] procedures.
>
> It thus appears that the change in the law has worked a substantial harm to Welsh. At the time of his offense, exemplary conduct during his imprisonment might well have resulted in parole. Under the later enactment, no evidence of satisfactory rehabilitation can overcome a finding that the nature of his crime makes him a socially undesirable candidate for parole....

*Id.* at 331 (footnotes omitted). The *Welsh* decision was, however, soon overruled by

our decision in *Heirens v. Mizell*, 729 F.2d 449 (7th Cir.), *cert. denied*, 469 U.S. 842, 105 S.Ct. 147, 83 L.Ed.2d 85 (1984). In reaction to *Welsh*, the panel in *Heirens* looked beyond the face of the two statutes to examine the actual practice of the Illinois Parole Board under the old parole statute, concluding:

> [The Illinois legislature] merely codified the Board's prior practice and procedure, that is, it simply explicitly articulated the Parole Board's broad range of discretion which had always existed. Since the Parole Board considered both general deterrence and retributive justice prior to 1973, the application of criterion (2) to inmates who committed their crimes before 1973 does not violate the *ex post facto* prohibition of the United States Constitution. The second criterion is *not* disadvantageous to an offender who committed his crime before January 1, 1973, as that criterion merely includes factors which were considered in making parole decisions prior to that date.

729 F.2d at 463 (emphasis in original).

The panel that originally heard Prater's appeal applied *Heirens* as the law of the circuit, ruling that "disadvantage" for *ex post facto* purposes[2] is "a factual question involving the actual practice of the Parole Board before and after the statutory change." *Prater*, 764 F.2d at 1236. The one difference between the panel's approach and the approach in *Heirens* is that the panel remanded the case to the district court for a hearing concerning the Board's practices, rather than resolving this issue of fact at the appellate level. Despite the availability to the panel in *Heirens* of a law review article by the former chairman of the Illinois Parole Board, *see Heirens*, 729

---

transmit to the Parole Board a statement of all "facts or circumstances which may tend to throw light on the question as to whether such prisoner ... is capable again of becoming a law-abiding citizen." Ill.Rev.Stat. ch. 38, § 806 (1961). It also required the Parole Board to give "due consideration and weight ... to the record of the prisoner's conduct kept by the superintendent or warden." *Id.* § 808a. *See Welsh*, 668 F.2d at 330–31; *Heirens*, 729 F.2d at 458.

2. "[T]wo critical elements must be present for a criminal or penal law to be *ex post facto:* it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." *Weaver v. Graham*, 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981) (footnotes omitted).

F.2d at 460 (citing Fields, *Illinois Parole and Pardon Board Adult Parole Decisions*, 62 Ill.B.J. 20 (1973)), the *Prater* panel thought the approach to fact-finding in *Heirens* an exception to the usual practice. Finally, the panel placed on the petitioner the burden of demonstrating "that the operation of the later statute is significantly more onerous in its effect than the operation of the former statute," *id.* at 1239, and the panel noted that this burden was a heavy one, *see id.*

The *en banc* majority here appears reluctant to follow the clear precedent in this circuit that is provided by *Heirens*. Although they are entitled to do this, the manner in which they sweep that controlling decision under the carpet is far from satisfying. *See supra* at 956. After all, if a factual inquiry can "cook" a petitioner's "goose," why can it not also demonstrate that he was disadvantaged by a statutory change that turned out *not* to be a mere codification of prior practice? Further, it seems that the use of law review articles as evidence of the Parole Commission's pre–1976 practices is as inappropriate a substitute for an evidentiary hearing here as it was in *Heirens*.

## II

Leaving *Heirens* to one side, and merely "compar[ing]" the parole statute in force in 1969 with the statute enacted in 1976 under which Prater was denied parole," *supra* at 954, I still cannot accept the majority's reasoning or conclusion. Certainly, I am surprised to see no reference at all in the majority opinion to *Welsh v. Mizell*, 668 F.2d 328, in which a unanimous panel of this court applied exactly this sort of "facial" analysis to two very similar Illinois statutes—and concluded that the change in statutory provisions would disadvantage a prisoner sentenced under the first.

The majority concludes that the 1976 statute is "if anything ... more liberal," *supra* at 954, a conclusion that I cannot help but think would surprise members of the 94th Congress, who enacted the new statute. This conclusion is based on the

substitution of a mandatory *"shall* be released"* for a permissive *"may ...* authorize release"*. But, as Judge Swygert notes, *infra* at 961–62, this permissive/mandatory distinction is not the only difference between the two statutes. A new criterion has been added to the statute, which, in the mandatory language of the 1976 statute, *bars* parole to any prisoner "whose release would ... depreciate the seriousness of his offense or promote disrespect for the law." A facial analysis of the 1969 statute would suggest that this same prisoner would have at least a chance at release, as long as it was not also found that his release would be "incompatible with the welfare of society." A panel of this court found such a change significant in *Welsh:* "At the time of his offense, exemplary conduct might well have resulted in parole. Under the later enactment, no evidence of satisfactory rehabilitation can overcome a finding that the nature of his crime makes him a socially undesirable candidate for parole." 668 F.2d at 331.

The majority does away with this objection by deftly demonstrating how general deterrence was clearly (though implicitly) a consideration under the 1969 statute. The 1973 guidelines, promulgated to guide the Parole Commission in its administration of the 1969 statute, provide that "the reasons for parole denial *may* include, but are not limited to ... [the consideration that] (1) Release at this time would depreciate the seriousness of the offense committed *and would thus be* incompatible with the welfare of society." 28 C.F.R. § 2.13(b) (1974) (emphasis supplied). Since it is agreed that the 1969 statute bars parole in any case in which release would be incompatible with the welfare of society, and since the 1973 regulation equates depreciation of offense severity with the welfare of society, the majority concludes that the 1969 statute bars release if it would depreciate the severity of the offense. "The clincher," in the majority's opinion, "is the 1973 guidelines." *Supra* at 955. Of course, the majority never explains why guidelines may be used to bring out "implicit" mean-

ings in statutes when those guidelines are assertedly not enactments to which the *ex post facto* prohibition applies.[3] Beyond that, this theory never explains away the permissive language of § 2.13(b) of the regulations. *See Rifai v. United States Parole Commission*, 586 F.2d 695, 699 (9th Cir.1978) ("[O]ffense severity has never been *excluded* as a consideration for parole release determinations.") (emphasis supplied).

The author of today's majority opinion, in his dissent from the panel opinion in the present case, expressed concern that "[a]ny federal prisoner who committed his crime before the enactment of the 1976 statute has a potential *ex post facto* claim under [the panel's decision]." *Prater*, 764 F.2d at 1242 (Posner, J., dissenting). Thus, it is worth noting that the *en banc* majority, while precluding *ex post facto* claims, has opened a different door through which those denied parole can make their way to this court. The mandatory/permissive distinction, as I read it, creates an entitlement to parole (providing the conditions of the statute are met). *See Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (statute providing that prisoners shall be released unless they fall into particular classifications creates an "expectancy of release" that "is entitled to some measure of constitutional protection").

### III

In sum, I believe that this case ought to be remanded for a factual inquiry into the practices of the United States Parole Commission under the 1969 parole statute, as *Heirens* would require. I might agree with Judge Swygert's able analysis were we writing on a clean slate, but as I have sought to demonstrate, the slate here is far from clean. In fact, our court has few slates as cluttered as this one regarding the *ex post facto* prohibition and parole statutes. We have failed, I believe, to develop doctrine in this area that is uninfluenced by the result of a particular case.

William Prater was partly responsible for one of the most brutal crimes in labor union history. I have no sympathy for his plight, but I believe that his case ought to have been decided in accordance with the law of the circuit. Therefore, I must respectfully dissent.

FLAUM, Circuit Judge, dissenting.

I respectfully dissent from the majority opinion for the reasons outlined in Part I and II of Judge Swygert's dissenting opinion.

SWYGERT, Senior Circuit Judge, dissenting.

The *ex post facto* clause[1] of the Constitution prohibits Congress from enacting any law "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325–26, 18 L.Ed. 356 (1867). An *ex*

---

**3.** I find most of the discussion of the *ex post facto* effect of the Commission's sentencing guidelines not only contradictory (in light of the majority's use of the 1973 guidelines in its "facial" analysis), but also unnecessary. In any event, I now think that it is worth mentioning that the law of this circuit on this point is not so clear as the majority suggests. It is true that in *Inglese v. United States Parole Commission*, 768 F.2d 932 (7th Cir.1985), we held that the 1973 parole guidelines were not "laws" for purposes of the *ex post facto* prohibition. But in *Rodriguez v. United States Parole Commission*, 594 F.2d 170 (7th Cir.1979), this court held that other regulations promulgated under the same rulemaking power as that used in *Inglese* (18 U.S.C. § 4203(a)(1)) and involving the same "no-

tice and comment" procedures, were "tantamount to a statute for the purpose of ... the *ex post facto* clause." *Rodriguez*, 594 F.2d at 179. Thus, it would appear that the appropriate test is less a mechanical inquiry into whether the regulations are "legislative" than it is a functional one into how much discretion the Commission retains and how much individualized attention the offender receives. *See Inglese*, 768 F.2d at 941–42 (Cudahy, J., concurring).

**1.** U.S. Const. art. I, § 9, cl. 3 ("No Bill of Attainder or *ex post facto* law shall be passed."). Art. I § 10, cl. 1 of the Constitution imposes the same limitation on the states.

*post facto* law must be retrospective and must disadvantage the offender affected by it. *Weaver v. Graham,* 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981). In this case we are asked to decide whether the denial of William Prater's application for parole by the United States Parole Commission violates the *ex post facto* clause. Specifically, we must determine whether a prisoner may have his application for parole denied on the basis of a parole statute enacted only after his conviction. Today a majority of this court concludes that Prater's continued detention does not violate the *ex post facto* clause. I cannot agree.

## I

Our examination of this case must begin with a comparison of the two parole statutes at issue. Prior to 1976 federal parole law provided that "if it appears to the Board of Parole ... that there is a reasonable probability that such prisoner will live and remain at liberty without violating the laws, and if in the opinion of the Board such release is not incompatible with the *welfare of society*, the Board may in its discretion authorize the release of such prisoner on parole." 18 U.S.C. § 4203(a) (1970 ed.) (emphasis added). Prater was denied parole on the basis of the Parole Commission and Reorganization Act of 1976 which provides that an inmate *"shall* be released" if release "would not depreciate the *seriousness of his offense* or promote disrespect for the law" and "would not jeopardize the *public welfare.*" 18 U.S.C. § 4206(a) (emphasis added).

As the majority points out, the *ex post facto* clause is relevant only to legislative enactments. Consequently, "all we should have to do to decide this case is compare the parole statute in force in 1969 with the statute enacted in 1976 under which Prater was denied parole." *Ante* at 954. The majority then decides that the application of the 1976 statute does not offend the Constitution for two reasons: (1) "[t]he new statute considered as a whole is not harsher than the old," *ante* at 955; and (2)

"[t]he interpretation in section 2.13(b)(1) [of the 1973 parole guidelines] links the old statute to the new and shows that ... they have the same meaning." *Ante* at 955.

The majority's contention that the 1976 statute is "more liberal" than the 1969 statute, *ante* at 954, is, frankly, difficult to understand. The opinion for the court focuses on the fact that the old statute was "discretionary" whereas the new statute is "mandatory." "The first reserves to the Commission discretion not to release the prisoner even if he meets the statutory conditions for parole; the second makes parole mandatory provided the statutory conditions are met." *Ante* at 954. With all due respect, the majority's emphasis on the discretionary and mandatory aspects of the two statutes is more ingenious than helpful. In the first place, a statute that vests discretion in a governmental entity is not necessarily more onerous or harsher than a statute that entitles an individual to a specific benefit upon the meeting of certain conditions. Discretion is often a quality of mercy. An individual like Prater, for example, who has committed a serious or notorious offense might well prefer to take his chances with the whim and caprice of the Parole Commission than with stringent and mandatory parole criteria. Without more, the fact that the 1969 statute is couched in the language of discretion and that the 1976 statute is couched in the language of entitlement tells us nothing about the relative severity of the statutes.

Second, it is important to remember that the discretionary/mandatory distinction becomes so critically important only because the majority chooses to frame the issue in those terms. No one just reading those two statutes would pay closer attention to whether the new statute is mandatory and the old statute discretionary. Instead, a disinterested reader would probably pay closer attention to the apparent change in the substantive criteria for determining parole eligibility. In ordinary English usage the phrase "incompatible with the welfare of society" connotes something entirely different from the phrase "would not depreci-

ate the seriousness of his offense or promote disrespect for the law." The former phrase indicates a concern for the effect of the prisoner's release on society. The latter phrase is directed toward the nature of the offense committed by the individual prisoner. Any impulse the average reader might have to equate the two phrases would be quickly deflected by the knowledge that the second statute, in addition to the "seriousness of the offense" criterion, includes a "public welfare" clause. The majority's reading of the statute makes this second "public welfare" clause superfluous. The majority chooses to avoid a common sense reading of the statutes by incorrectly framing the issue as a dispute over the meaning of the shift from the language of discretion to the language of entitlement.

Finally, the majority's idiosyncratic reading of the statutes directly conflicts with the Government's position in this case. In the petition for rehearing and suggestion for rehearing *en banc*, the United States Attorney for the Southern District of Indiana asserts that "the Commission still enjoys the same discretion in granting parole as it did under the prior statute; and that discretion is written into the statute." Petition for Rehearing at 6. The Government points out in its brief that 18 U.S.C. § 4206(c) states that "the Commission may grant *or* deny release on parole *notwithstanding* the guidelines referred to in subsection (a) of this section if it determines there is good cause for so doing." (emphasis added). Elsewhere, the Government declares "that the strong language of the statute has been modified by additional language in the statute and the Commission's discretion is intact so long as they [sic] observe some basic due process procedures." Petition for Rehearing at 5 n. 3. Obviously, either the Government or this court is misreading the statutes.[2] Ironically, our decision may serve to severely ham-

per the heretofore broad flexibility of the parole commissioners.

## II

The majority's second argument—that the 1973 guidelines prove that the two statutes mean the same thing—is deeply puzzling. The majority relies on that section of the 1973 guidelines which provides that "reasons for parole denial may include, but are not limited to ... (1) Release at this time would depreciate the seriousness of the offense committed and would thus be incompatible with the welfare of society." 28 C.F.R. § 2.13(b) (1974). It is this provision that, according to the majority, "links the old statute to the new and shows that ... they have the same meaning." *Ante* at 955. "The clincher," we are told, "is the 1973 guidelines." *Ante* at 955. What is puzzling about the majority's reliance on the 1973 guidelines is that in the same opinion the majority takes great pains to point out that guidelines are not laws and that the *ex post facto* clause applies only to laws. "[T]he guidelines (at least so far as relevant to this case) are not laws within the meaning of the ex post facto clauses...." *Ante* at 954. Indeed, the majority summarily rejects Prater's attempt to argue that the *ex post facto* clause does apply to parole guidelines. This court, as the majority points out, has previously held that parole guidelines are not laws for purposes of the *ex post facto* clauses. *Inglese v. United States Parole Commission*, 768 F.2d 932, 936 (7th Cir.1985). The 1973 guidelines are thus totally irrelevant to the question of whether the 1976 statute may be constitutionally applied to Prater. The internal logic of the majority's own opinion prohibits it from relying on those guidelines. But without the guidelines we are left with only the bare language of the statutes and that language will not support the construction the majority would like to erect upon it.

---

2. *See also Inglese v. United States Parole Comm'n,* 768 F.2d 932, 936 (7th Cir.1985) ("The statute, the parole regulations, and the policy statements contained therein clearly and re-

peatedly emphasize the discretionary aspect of the decision-making process of parole, particularly in the use of the guidelines.").

## III

The original panel opinion relied on an earlier decision of this court, *Heirens v. Mizell*, 729 F.2d 449 (7th Cir.1984), in holding that the question of whether an *ex post facto* violation has occurred is a question of fact. The original panel (of which I was a member) held that a reviewing court may inquire into the actual parole decisionmaking processes under the 1976 statute in order to determine whether an *ex post facto* violation had occurred. In retrospect I believe the original panel decision in *Heirens* was incorrectly decided and that it was wrong to have relied on *Heirens*. Because the *ex post facto* clause prohibition attaches only to legislative enactments, the question of whether an *ex post facto* violation has occurred is a matter of law. The sole issue in a case such as this is whether a new legislative enactment, on its face, has retroactive and detrimental effect. *Welsh v. Mizell*, 668 F.2d 328 (7th Cir. 1982), is the more accurate statement of the law and was, in my view, incorrectly overruled by *Heirens*.

The majority *en banc* opinion in this case carefully avoids a direct rejection of *Heirens* but clearly suggests that the *Heirens* approach is inconsistent with its general approach. The majority views the factual analysis undertaken in *Heirens* as unnecessary to support the result reached in that case. The inquiry into actual practice merely "cooked the petitioner's goose." The majority thus tacitly rejects the analytic approach of *Heirens* and in this, at least, I agree with the majority opinion. Moreover, the only question of law in this case relates to the exact meaning of the two parole statutes. To answer that question, we again have only one reliable guide: the bare language of the statutes themselves.

## IV

Although I now disagree with the rationale of the original panel decision, I continue to believe that the application of the 1976 statute to William Prater violated the *ex post facto* clause. Since the majority has reminded us of the seriousness and brutality of the crime Prater stands convicted of conspiring to complete, it should be noted that after Prater's initial parole hearing he was recommended for parole effective August 8, 1982. During his confinement he has had no disciplinary "write-ups" and has been gainfully employed in prison industries. He has no prior convictions and no history of drug dependence. He received the highest possible "salient factor" score of ten from the parole authorities. He is now sixty-seven years old. There really can be no serious doubt that Prater would not be in prison today but for the application of the 1976 "depreciate the seriousness of his offense" criterion and the majority virtually concedes the point. "Because of Prater's age ... and because he was a model prisoner and had no prior convictions and no history of drug abuse, he might have been paroled upon first becoming eligible, had it not been for the notoriety of his crime." *Ante* at 949.

The facts of the case and the language of the statutes speak for themselves. William Prater's continued incarceration is unconstitutional. Today, that injustice receives the imprimatur of this court.